UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JOHN G. LABRECQUE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:14-cv-00357-JAW |
| | ) | |
| RAY MABUS, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

John LaBrecque is an employee at the Portsmouth Naval Shipyard.  He was promoted to a supervisory position in 2011 shortly after he complained to the Shipyard's Equal Employment Opportunity (EEO) office about age discrimination. Mr. LaBrecque claims that ever since this complaint and promotion, he has been subjected to retaliation and a hostile work environment.  The Navy moves for summary judgment on all of Mr. LaBrecque's claims.

After winnowing through a hotly contested record, the Court determines that Mr. LaBrecque failed to demonstrate any disputes of material fact that would allow a reasonable jury to conclude that any of the adverse actions taken against him were causally connected to his EEO complaints.  Mr. LaBrecque also fails to produce sufficient facts from which a reasonable jury could conclude there was severe, pervasive harassment on the basis of age giving rise to a hostile work environment. The Court grants the Navy's motion for summary judgment in its entirety.

## I.    PROCEDURAL BACKGROUND

On September 10, 2014, John LaBrecque filed a complaint in this Court against Ray Mabus, Secretary of the Navy, containing one count of retaliation under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e *et seq. Compl. and Demand for Trial by Jury* (ECF No. 1).  On January 26, 2015, Mr. LaBrecque moved to amend his complaint, adding a retaliation claim under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq.*, as well as a hostile work environment claim under Title VII. *Pl.'s Mot. to Amend the Compl.* (ECF No. 9).  The Navy filed a partial opposition to the motion to amend the complaint submitting that the Court should reject Counts II and III of the proposed First Amended Complaint, alleging gender-based hostile work environment and retaliation under Title VII, because Mr. LaBrecque did not exhaust his administrative remedies. *Def.'s Partial Opp'n to Pl.'s Mot. to Amend the Compl.* (ECF No. 10).  Mr. LaBrecque replied on March 3, 2015. *Pl.'s Reply in Supp. of His Mot. to Amend the Compl.* (ECF No. 14).  On July 21, 2015, the Magistrate Judge issued a memorandum decision granting the motion to amend with respect to the addition of the claim under the ADEA but denying the motion with respect to the claims for hostile work environment and retaliation under Title VII. *Mem. Decision on Mot. to Amend* (ECF No. 17).  Mr. LaBrecque filed the First Amended Complaint on July 27, 2015 alleging the sole count of retaliation under the ADEA. *Pl.'s Am. Compl. and Demand for Trial by Jury* (ECF No. 19) (*Am. Compl.*).

After the completion of discovery, the Court held a Local Rule 56(h) pre-filing conference on March 4, 2016. *Min. Entry* (ECF No. 45). On April 15, 2016, the parties filed a joint record and joint factual stipulations. *Joint Record* (ECF No. 49) (*J.R.*); *Joint Factual Stips.* (ECF No. 50) (*Stips.*). On April 25, 2016, the Navy filed a motion for summary judgment and a statement of undisputed material facts. *Def.'s Mot. for Summ. J.* (ECF No. 51) (*Def.'s Mot.*); *Statement of Undisputed Material Facts in Supp. of Def.'s Mot. for Summ. J.* (ECF No. 52) (DSMF). On June 23, 2016, Mr. LaBrecque filed an opposition to the Navy's motion for summary judgment, a responsive statement of material facts, and an additional set of material facts. *Pl.'s Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 68) (*Pl.'s Opp'n*); *Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts and Pl.'s Statement of Additional Material Facts* at 1-25 (ECF No. 69) (PRDSMF); *id.* at 25-32 (PSAMF). On July 11, 2016, the Navy filed a reply brief and a reply statement of facts. *Def.'s Reply Brief in Supp. of Mot. for Summ. J.* (ECF No. 72) (*Def.'s Reply*); *Def.'s Resps. to Pl.'s Statement of Additional Material Facts* (ECF No. 73) (DRPSAMF).

## II.   STATEMENT OF FACTS[1]

### A.   Organization of the Portsmouth Naval Shipyard & John G. LaBrecque's Position

At the Portsmouth Naval Shipyard (Shipyard), located in Kittery, Maine, the Department of the Navy (the Navy) overhauls, repairs, and modernizes nuclear submarines. *Stips.* ¶ 1; DSMF ¶ 1; PRDSMF ¶ 1. When a submarine is undergoing

---

[1]      In accordance with "conventional summary judgment praxis," the Court recounts the facts in the light most favorable Mr. LaBrecque's theory of the case, consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).

work at the Shipyard, it is frequently referred to as a project and/or identified by its name or hull number.  *Id.*

John LaBrecque began working at the Shipyard in November 1989.  PSAMF ¶ 1; DRPSAMF ¶ 1.  He consistently received positive performance reviews and feedback from his supervisors and peers, resulting in a promotion in May of 1999 to Painter, and again in September 2004 to Painter Leader (also referred to as a Worker Leader).  *Stips.* ¶ 7; PSAMF ¶ 1; DRPSAMF ¶ 1.  At all times relevant to this litigation, Mr. LaBrecque has been employed at the Shipyard, at times as a WL-4102-09 Painter Leader and at times as a WS-4102-09 Painter Supervisor, and assigned to an organizational unit called the Painting and Blasting Shop (Shop 71).  *Stips.* ¶ 2; DSMF ¶ 2; PRDSMF ¶ 2.  The Painting and Blasting Shop is part of a larger organizational unit called the Coating and Coverings Code (Code 970).  *Id.*  Code 970 is, in turn, part of the still larger Production Resources Department (Code 900).  *Id.*

At all times relevant to this litigation, Code 970 has been managed by a GS-14 Superintendent, who is assisted by several GS-13 managers, including at least one Operations Manager.  DSMF ¶ 6; PRDSMF ¶ 6.  The Shop to which Mr. LaBrecque was assigned, Shop 71, was managed by a General Foreman.  DSMF ¶ 7; PRDSMF ¶ 7.  The General Foreman is a GS-12 management employee who reports directly to the Code 970 Operations Manager.  *Id.*  The Code 970 Superintendent was the General Foreman's second-line supervisor.  *Id.*

A Shop 71 Painter Supervisor is sometimes assisted by a WL-09 Painter Leader and can lead a team of approximately five to forty employees, who are

frequently referred to as mechanics or painter/blasters. *Stips.* ¶ 4; DSMF ¶ 8; PRDSMF ¶ 8. These employees may be WG-05, WG-07, and WG-09 helpers, apprentices, and journeymen whose trade is marine painting and blasting. *Id.* Their work includes the application of various coatings on interior and exterior surfaces, tanks, and voids aboard submarines. *Id.* In addition to work performed aboard submarines, work is also performed off the submarines, which is referred to as other productive work or overhead work. *Id.*

Crews of painter/blaster mechanics, led by Shop 71 Painter Supervisors, can be assigned as needed to perform work on various submarines undergoing overhaul, repair, and modernization work. *Stips.* ¶ 5; DSMF ¶ 9; PRDSMF ¶ 9. The number of submarines at the Shipyard varies, but it is common for there to be three at any given time. *Id.* The number of painter/blaster crews assigned to each submarine, as well as the shifts to which they are assigned, also varies according to production needs. *Id.*

In the 2011/2012 timeframe, Zone Managers provided Painter Supervisors with daily direction concerning the work to be completed on a project during their shift. DSMF ¶ 11; PRDSMF ¶ 11. Over the course of a year, a Painter Supervisor typically worked on multiple projects, and received direction from several different Zone Managers. *Id.* Because Painter Supervisors received direction from multiple managers over the course of the year in 2011 and 2012, the Shop 71 General Foreman was given the task of mentoring and completing the performance evaluations of all

Shop 71 Painter Supervisors in Code 970.  *Id.*[2]  Prior to 2011, Project Managers, not General Foremen, completed the evaluations.  *Id.*  General Foremen are rarely on the projects or the boats.  *Id.*

The timely planning and execution of work on specific projects are critical to the success of a project, each of which is governed by a project-specific budget that is carefully monitored by the Superintendent of Code 970 and others in management above him.  DSMF ¶ 12; PRDSMF ¶ 12.[3]  The tasks assigned to particular crews on any given day are usually communicated from the Zone Managers to the Supervisors at the beginning of a day shift.  DSMF ¶ 13; PRDSMF ¶ 13.  The day-shift Zone

---

[2]       Mr. LaBrecque qualifies paragraph 11 by denying that General Foremen monitor and complete performance evaluations.  PRDSMF ¶ 11.  He cites the deposition transcript of Carl Crosby to support his denial.  However, the Crosby deposition transcript actually further supports the Navy's statement.  Carl Crosby testified that in 2011, the General Foreman, Daniel Kays, did complete the evaluations, which Mr. Crosby says was "kind of odd because before, [General Foremen] didn't do them."  *J.R.* Attach. 12 *Dep. of Carl Crosby* 51:11-52:6 (*Crosby Dep.*).  He adds that he had never seen a Foreman complete the evaluations because "how would they know how our – how do they know what we're doing, and they're not on the project."  *Id.* 52:10-13.  This testimony matches the Navy's statement, which is not that General Foremen typically mentor and complete performance evaluations, but that *in the 2011/2012 timeframe*, because a Painter Supervisor worked on multiple projects and had multiple supervisors, the Shop 71 General Foreman mentored and completed performance evaluations.  DSMF ¶ 11 (citing *Decl. of Daniel Kays* ¶ 3 (ECF No. 56) (*Kays Decl.*)) (emphasis added).  The Court rejects the denial.  However, because it must view the facts in a light most favorable to the nonmovant, the Court qualifies the statement to include the caveat that prior to 2011 the General Foremen did not complete evaluations, and that the General Foremen are rarely on the project or on the boats.

       Mr. LaBrecque makes this general objection about the General Foremen's ability to complete performance evaluations throughout his responses to the Defendant's statement of material facts; the Court refers back to this footnote to address that issue.

[3]       Mr. LaBrecque qualifies this statement: "Deny that the execution of work is governed by the Superintendent and upper management.  It is the project managers who actually oversee the day to execution; the Superintendents and upper management play a role that is more akin to a staffing agency."  PRDSMF ¶ 12.  He again cites Mr. Crosby's testimony in which Mr. Crosby explains that the Superintendent, Operations Manager, and General Foreman are rarely on the project or on the boats, and that the Supervisors get their work from Zone Managers.  *Crosby Dep.* 54:8-55:23.

       However, the Court interprets the Navy's statement to mean that the Superintendent and upper management carefully monitor the project-specific budget, not the actual work.  *See Decl. of Charles MacDonald* ¶ 6 (ECF No. 57).  The Court rejects Mr. LaBrecque's denial as nonresponsive.

       As for Mr. LaBrecque's qualification that the Project Managers oversee the day-to-day execution of work, this statement is already reflected in the record, *see* DSMF ¶ 13; PRDSMF ¶ 13, and therefore rejects as redundant the additional qualification here.

Manager and first-shift Supervisor provide direction to the second-shift Zone Manager and second-shift Supervisor during shift turnover. *Id.* The Zone Managers assign priorities for work to be completed. *Id.*[4] At the conclusion of the second and/or third shift, the Supervisor of the crew usually completes a written turnover sheet, which describes what work was completed, and what, if any, work the crew could not complete during the shift. *Id.*

## B.   John G. LaBrecque's Informal EEO Complaint of January 2011

In 2009, despite his hard work and seniority, Mr. LaBrecque was denied a promotion to Supervisor. *Stips.* ¶ 8; PSAMF ¶ 2; DRPSAMF ¶ 2. Instead, the positions went to four other Worker Leaders who were all younger and less experienced than him. PSAMF ¶ 2; DRPSAMF ¶ 2.[5] After bringing this issue to his

---

[4]      Mr. LaBrecque qualifies this statement, stating "[i]t is unclear whether the 'zone managers' referred to here are the same as project managers, such as Thomas Moody in 2011, as the project managers are the ones who assigned work priorities." PRDSMF ¶ 13. He cites his Interrogatory Responses which refer to Mr. Moody as a "Project or Zone Manager" and say nothing about the particular type of manager who assigns work priorities. *See J.R.* Attach. 2 *Kunz Ex. 7, Pl.'s Resps. To Def.'s First Set of Interrogs.* at 9 (*Pl.'s Resps. to Interrogs.*).
         The only other support Mr. Labreque offers for his qualification distinguishing between Project and Zone Managers is his own Statement of Additional Material Facts. However, citing one's own statement of facts is not proper under the Local Rules. *See* D. ME. LOC. R. 56(c) ("The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, *shall support each denial or qualification by a record citation*") (emphasis added); *see also Lewis v. Gillette Co.*, 22 F.3d 22, 24 (1st Cir. 1994) ("The nonmoving party may not rest upon mere allegation or denials of his pleading") (internal quotations omitted). Because nothing in the record citation supports Mr. LaBrecque's assertion that Project Managers, not Zone Managers, assign work priorities, the Court admits the statement as originally written by the Navy, which is supported by Mr. Kays' declaration. *See Kays Decl.* ¶ 4.
[5]      The Navy admits paragraph two in part and requests to strike and denies the remainder of the paragraph. The Navy admits that Mr. LaBrecque applied for and did not receive a promotion to Supervisor in 2009. However, the Navy argues that the rest of paragraph two is unsupported by the cited record in violation of Local Rule 56(f). More specifically, the Navy contends that the cited material, Mr. LaBrecque's responses to interrogatories, "consists of conclusory and speculative statements, devoid of supporting facts, regarding the motive of an unidentified selecting official with respect to unidentified comparators whose qualifications are not described" and therefore should be stricken. DRPSAMF ¶ 2.

7

The Court agrees with the Navy's objections in part. Mr. LaBrecque's original statement included the language "[a]fter bringing this blatant age discrimination issue to his shop head's attention." PSAMF ¶ 2. Whether the conduct described constituted age discrimination is a central disputed issue in this lawsuit. Mr. LaBrecque's assertions are argument, not evidence. The Court affords no evidentiary weight to "conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative." *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *see also* D. ME. LOC. R. 56(f) ("A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts"). The Court removes the language "blatant age discrimination" from the statement and notes that it only burdens the Court to include rhetorical phrasing in a statement of supposedly undisputed facts.

The remainder of Mr. LaBrecque's statement concerning the positions going to other younger and less experienced workers is proper because it is based on his firsthand knowledge and supported by particularized information. *See Perez v. Volvo Car Corp.*, 247 F.3d 303, 316–17 (1st Cir. 2001) (concluding that statements that are "insufficiently supported with particularized factual information . . . are not eligible for inclusion in the summary judgment calculus"). In the cited material, Mr. LaBrecque provides the name of at least one specific individual, Chris Nunan, who was approximately 30 years old and had only five years of experience but was promoted before him. *Pl.'s Resps. to Interrogs.* at 3. Additionally, Mr. LaBrecque has worked at the Shipyard for just under thirty years and, based on his observations and time at the Shipyard, the Court can reasonably infer that he knew the approximate ages and experience levels of his coworkers. The Court denies the request to strike the remaining facts in paragraph two.

The Navy makes a general objection to all of Mr. LaBrecque's statement of facts that cite his own Interrogatory Responses for support. DRPSAMF ¶ 2 n.2. It explains that his Interrogatory Responses "largely parrot the allegations in [his] Amended Complaint" and argue that a party cannot "rest upon mere allegation or denials of his pleading." *Id.* (citing *Lewis*, 22 F.3d at 24). Therefore, it argues that paragraph two, and "every other similarly unsubstantiated 'fact' should be stricken." *Id.*

The Court acknowledges that portions of Mr. LaBrecque's Interrogatory Responses are largely a recitation of the allegations in the Amended Complaint. The Court agrees that by citing generally to his own Interrogatory Responses, Mr. LaBrecque has unnecessarily added to the burden of the Navy and the Court to separate his responses based on argument from those based on evidence, the distinction not always being clear. However, answers to interrogatories are a proper part of the summary judgment calculus, *see Gillen*, 283 F.3d at 20, thus, so long as Mr. LaBrecque's statements, supported by his Interrogatory Responses, contain "specific facts, in suitable evidentiary form" and do not consist of "conclusory allegations, improbable inferences, and unsupported speculation," the Court will consider them for purposes of this motion. *Lopez-Carrasquillo v. Rubianes*, 230 F.3d 409, 413 (1st Cir. 2000); *see also Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 53 (1st Cir. 2000) ("To the extent that affidavits submitted in opposition to a motion for summary judgment merely reiterate allegations made in the complaint, without providing specific factual information made on the basis of personal knowledge, they are insufficient . . . However, a party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment").

Finally, to support its denial of the remainder of paragraph two, the Navy says that "Plaintiff's own deposition testimony contradicts the conclusory and unsubstantiated statements in his Interrogatory Responses." DRPSAMF ¶ 2. The Navy cites a portion of Mr. LaBrecque's testimony in which he admits that Carl Crosby was an older, experienced Worker Leader who was promoted to Supervisor in 2009. *See J.R.* Attach. 10 *Dep. of John G. LaBrecque* 24:25-26:6 (*LaBrecque Dep.*). However, in that same portion of Mr. LaBrecque's testimony he clarifies that Mr. Crosby was promoted during a different timeframe than the four younger worker leaders that he discusses in his Interrogatory Responses. *Id.* 25:13-22. The Court concludes that Mr. LaBrecque's testimony does not conflict with his statements in paragraph two and rejects the denial.

8

shop head's attention, Mr. LaBrecque was told that he would get the next Supervisor opening. *Id.* In December 2010, Mr. LaBrecque again applied for and did not receive a Supervisor promotion, the position going to another worker leader who was much younger than him and far less experienced. *Stips.* ¶ 8; PSAMF ¶ 3; DRPSAMF ¶ 3.[6]

As a result, on January 27, 2011, Mr. LaBrecque filed an informal complaint of discrimination with the Shipyard's EEO office. *Stips.* ¶ 9; DSMF ¶ 14; PRDSMF ¶ 14; PSAMF ¶ 4; DRPSAMF ¶ 4. At that time, he alleged that he had been denied a promotion to Painter Supervisor due to age (41), disability (tendinitis in both hands), and in retaliation for an informal EEO complaint he had filed in 2008. *Id.* At the time Mr. LaBrecque filed his informal EEO complaint Dana Hamil was the Code 970 Superintendent and Roland Hudson was the Shop 71 General Foreman. DSMF ¶ 15; PRDSMF ¶ 15.

Mr. LaBrecque elected to participate in an informal mediation of his complaint, which was held on March 10, 2011. DSMF ¶ 16; PRDSMF ¶ 16; PSAMF ¶ 5; DRPSAMF ¶ 5. Mr. LaBrecque's personal representative was Terrance Barry, a union steward. DSMF ¶ 17; PRDSMF ¶ 17. The Agency's Management Official at the mediation was Fred Kunz. *Id.* Mr. Kunz had been named the Code 970 Superintendent in February 2011. DSMF ¶ 18; PRDSMF ¶ 18. He had previously worked in Code 950 (Electrical) and had no prior involvement with Code 970 or with Mr. LaBrecque. *Id.*

---

[6]     The Navy admits that Mr. LaBrecque applied for and did not receive a promotion to Supervisor in 2010 but requests to strike and denies the remainder of the statement on the same grounds as stated in DRPSAMF ¶ 2. The Court denies the request to strike and rejects the denial. *See supra* note 5.

9

During the mediation, Mr. LaBrecque explained to Mr. Kunz the age discrimination to which he had been subjected, and the reason he filed his complaint. PSAMF ¶ 5; DRPSAMF ¶ 5.  Mr. Kunz harshly replied, "I will promote anybody I feel like." *Id.*[7]  It may have been that Mr. Kunz used a harsh tone because he was upset that Mr. LaBrecque had used the EEO process.  *Id.*  The individuals also discussed an appointment to Supervisor that would start sometime in March and last for one year, which Mr. Hamil and Mr. Hudson originally told Mr. LaBrecque he would receive after he filed his informal EEO complaint.  *Id.*[8]  Because Mr. LaBrecque was

---

[7]     This statement in paragraph five originally read: "Mr. Kunz harshly replied, 'I will promote anybody I feel like,' making it evident that he was upset that Plaintiff had used the EEO process." PSAMF ¶ 5.  The Navy requests to strike the assertion that Mr. Kunz was "upset that Plaintiff had used the EEO process" because, it argues, it is an "unsubstantiated conjecture."  DRPSAMF ¶ 5 (citing *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007)).  The Court agrees.  Other than Mr. Kunz's harsh tone, there is no evidence in the record citation to support Mr. LaBrecque's inference that it was "evident" that Mr. Kunz was upset that he had used the EEO process at this time.  Accepting for purposes of the motion that Mr. Kunz's tone was harsh, it does not necessarily follow that he was upset that Mr. LaBrecque used the EEO process, especially given the undisputed fact that Mr. Kunz recommended and gave Mr. LaBrecque a promotion after the filing of the EEO complaint, with knowledge of the complaint.  *See* DSMF ¶¶ 20-22.  The Court sustains the Navy's objection in part.  *See Cabán Hernández*, 486 F.3d at 8 (holding that although courts must draw all reasonable inferences in the light most favorable to the nonmovant, they need not "draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective").

At the same time, from what Mr. Kunz stated when he used the harsh tone, a factfinder could conclude that he was upset that Mr. LaBrecque was challenging management's discretion in making promotion decisions, and the EEO complaint was part of that challenge.  The Court alters this portion of the statement to reflect that it may have been that Mr. Kunz used a harsh tone because he was upset that Mr. LaBrecque had used the EEO process.

The Navy also denies that Mr. Kunz "harshly replied, 'I will promote anybody I feel like.'" DRPSAMF ¶ 5.  It cites Mr. Kunz's testimony in which he says that he told Mr. LaBrecque that he intended to promote individuals based on their ability, not based on their longevity at the Shipyard and that he "believe[s] in the EEO process."  *J.R.* Attach. 1 *Tr. of Dep. of Frederick W. Kunz* 28:6-15, 30:7-9 (*Kunz Dep.*).  This testimony conflicts with Mr. LaBrecque's version of the events.  *See Pl.'s Resps. to Interrogs.* at 4.  Charged as it is to recount the facts in a light most favorable to the nonmovant, *Gillen*, 283 F.3d at 17, the Court rejects the Navy's denial and retains Mr. LaBrecque's version of what happened during the mediation.

[8]     The Navy requests to strike a portion of paragraph five that originally stated that Mr. LaBrecque "was told that he would receive a one-year appointment as Supervisor to start sometime in March 2011" as a result of the mediation.  DRPSAMF ¶ 5.  It argues that the assertion is "unsupported by the cited record material in violation of Local Rule 56(f)."  *Id.*  It also denies that Mr. LaBrecque received the promotion "as a result of the mediation" because, it states, Mr. Kunz made the

assigned to Acting Supervisor as a result of the EEO filing, no further action on the complaint was taken. *Id.* No written settlement agreement was produced at the mediation. DSMF ¶ 19; PRDSMF ¶ 19.[9]

### C.   John G. LaBrecque's Promotion to Supervisor Effective March 27, 2011

Effective March 27, 2011, Mr. LaBrecque was given a temporary 120-day promotion to a Painter Supervisor position. DSMF ¶ 20; PRDSMF ¶ 20.[10]   Mr. Kunz

---

decision to promote Mr. LaBrecque before the mediation. *Id.* (citing *J.R.* Attach. 4 *Kays Ex. 16 Manager Action Req. Form* at 1 (*Req. Form*)).

The Court agrees that Mr. LaBrecque's statement that he was promoted as a result of the mediation is not directly supported by the record citation. *See Pl.'s Resps. to Interrogs.* at 4 ("Because I was assigned to Acting Supervisor as a result of *the EEO filing*") (emphasis added). However, the record does support the general assertion that Mr. Hudson and Mr. Hamil told Mr. LaBrecque that he would receive a one-year Supervisor position after he filed his EEO complaint, and that this position was discussed during the mediation. *See Pl.'s Resps. to Interrogs.* at 3–4. It is reasonable to infer from these facts that Mr. Kunz gave Mr. LaBrecque the promotion as a result of the EEO filing, in an effort to resolve the age discrimination issue. In order to recount the facts in a light most favorable to the nonmovant, the Court does not strike the statements but revises them to more accurately reflect the record evidence.

Finally, the Navy qualifies the statement in part to state that Mr. LaBrecque "was given a temporary, non-competitive promotion to Supervisor, not to exceed 120 days." DRPSAMF ¶ 5. The Court agrees that the Shipyard records reflect this information. *See Req. Form* at 1. However, Mr. LaBrecque's statement refers to what he was allegedly told by Mr. Hamil, Mr. Hudson, and Mr. Kunz about the length of the promotion. The Court is required to view the facts in a light most favorable to the nonmovant's theory for purposes of summary judgment. Additionally, because the Navy's qualification is later reflected in the record, the Court rejects the qualification here. *See infra* note 10.

[9]   Mr. LaBrecque denies paragraph 19, stating "[a]n agreement was reached at mediation that [he] would be assigned to Acting Supervisor as a result of the EEO filing and mediation." PRDSMF ¶ 19. He cites his responses to the interrogatories, in which he says "[b]ecause I was assigned to Acting Supervisor as a result of the EEO filing, no further action on the complaint was taken." *Pl.'s Resps. to Interrogs.* at 4.

In support of its statement in paragraph 19, the Navy cites Terry Burk and Mr. LaBrecque's deposition transcripts, in which they testify only that no *written* settlement agreement was produced. *See J.R.* Attach. 7 *Dep. of Terry Burk* 11:20-12:17 (*Burk Dep.*); *LaBrecque Dep.* 35:3-36:8. The Court revised the statement to clarify that no written agreement was produced.

[10]   Mr. LaBrecque objects to and qualifies this statement. As regards the objection, Mr. LaBrecque argues: "This statement is not supported by the record citation. The Defendant cites to the deposition testimony of Terry Burk in support of this assertion, and the referenced citation makes it clear that Mr. Burk does not recall why or the type of promotion that Mr. LaBrecque received." PRDSMF ¶ 20.

The Court disagrees in part. In addition to the deposition of Mr. Burk, the Navy cites a form describing Mr. LaBrecque's positions that shows that he received a promotion, effective March 27, 2011, "NTE 23-JUL-2011." *See J.R.* Attach. 13 *Fleet HRO* at 1. The Court interprets this document to mean that Mr. LaBrecque's promotion was not to exceed July 23, 2011, which was 120 days later.

was the deciding official responsible for selecting Mr. LaBrecque for the temporary promotion. DSMF ¶ 21; PRDSMF ¶ 21. Shipyard records reflect that Mr. Kunz selected Mr. LaBrecque prior to the mediation, shortly after becoming the new Code 970 Superintendent. DSMF ¶ 22; PRDSMF ¶ 22.[11] Mr. LaBrecque was under the impression that the promotion would last for a year. DSMF ¶ 20; PRDSMF ¶ 20. The temporary promotion formally expired in June of 2011, but Mr. LaBrecque continued to function as a Supervisor on projects at a lower rate of pay. DSMF ¶ 25; PRDSMF ¶ 25.[12]

Almost immediately after his assignment to Painter Supervisor, Mr. LaBrecque was constantly subjected to degrading and demeaning comments, treated differently by management, and accused by members of his team of receiving the assignment because he filed an EEO complaint. PSAMF ¶ 6; DRPSAMF ¶ 6.[13] In

Additionally, although not cited in this particular statement of fact, the record reflects that the promotion was temporary and for 120 days. *See Req. Form* at 1. However, the Court agrees that there is no support that the promotion was "non-competitive" and excises this portion of the statement.

As regards the qualification, Mr. LaBrecque says that he was given the promotion as a result of the mediation and was told that the promotion was for a year. The Court has already discussed these issues, *see supra* note 8, but clarifies that Mr. LaBrecque was under the impression that the Supervisor position was for one year.

[11]    Mr. LaBrecque denies this statement. He maintains that he was promoted to Acting Supervisor as a result of the EEO filing and mediation and argues that "the Shipyard's own records reflect that the promotion was not officially recorded until March 27, 2011." PRDSMF ¶ 22 (citing *Fleet HRO*). The Court has already addressed the first part of Mr. LaBrecque's denial. *See supra* note 8. As to the second part, the Court disagrees. The document cited by Mr. LaBrecque states that the "Eff Dt," or effective date, of the promotion was March 27, 2011. *Fleet HRO* at 1. However, the form cited by the Navy shows that Mr. Kunz approved the promotion on February 28, 2011 and that the request was recorded on March 1, 2011. *See Req. Form* at 1. The Court rejects the denial.

[12]    Mr. LaBrecque qualifies this statement to include that he was told that the promotion was for a year and that he continued to function as a supervisor but at a lower rate of pay. PRDSMF ¶ 25. The Court has already addressed the first qualification. *See supra* note 8. The Court concludes that the record supports the second qualification, *see Pl.'s Resps. to Interrogs.* at 5, which the Court included.

[13]    The Navy requests to strike a portion of paragraph six that originally read: "Almost immediately after his assignment to Acting Supervisor, Plaintiff began to be subjected to inappropriate retaliatory behavior due to his protected activity of filing an EEO complaint." DRPSAMF ¶ 6. The Navy argues that the statement is a legal conclusion, not a statement of fact. *Id.* Whether the conduct

July 2011, the day-shift Supervisor, Michael Parry, was upset that Mr. LaBrecque would not assign one of the members of his team to a certain job. *Id.* Mr. Parry called Mr. LaBrecque a "fucking idiot" and said the only reason that he was a Supervisor was because he was involved in an EEO proceeding. *Id.* Mr. LaBrecque emailed Mr. Kunz about the incident and Mr. Kunz held a meeting with Mr. LaBrecque, Mr. Parry, and Tom Dyer, Mr. Parry's boss. *Id.*[14] Beyond the meeting, no other action was taken. *Id.*

---

in the workplace was retaliatory is a central disputed issue in this lawsuit. Mr. LaBrecque's assertions are argument, not evidence. The Court has not included this argumentative phrase in its statement of material facts.

The Navy also requests to strike and denies the portion of the statement that says that Mr. LaBrecque was constantly subjected to degrading and demeaning comments:

> The cited Plaintiff's Interrogatory Response consists of conclusory and speculative statements by Plaintiff that are devoid of supporting facts. He does not specify what comments were made that he believes to be degrading or demeaning, when they were made, or by whom. This portion should therefore be stricken.

DRPSAMF ¶ 6. The Court disagrees. Mr. LaBrecque goes on to provide at least one specific example of a comment by one supervisor, Michael Parry, that Mr. LaBrecque was a "fucking idiot" and that he only received his position because of his EEO complaint. *See* PSAMF ¶ 6 (citing *Pl.'s Resps. to Interrogs.* at 5). In his responses, Mr. LaBrecque explains other instances of criticisms and disparate treatment. *Pl.'s Resps. to Interrogs.* at 4–5. Viewing the facts in a light most favorable to Mr. LaBrecque's theory of the case, one can reasonably infer that Mr. LaBrecque subjectively believed this comment, as well as other similar comments, to be "degrading and demeaning." The Court overrules the Navy's objection.

[14]    The Navy denies the statements that Mr. Parry called Mr. LaBrecque a "fucking idiot" and said that the only reason he was a Supervisor was because he was involved in an EEO proceeding. DRPSAMF ¶ 6. It also denies that no action was taken. *Id.*

As to the alleged statements by Mr. Parry, there is a genuine dispute of fact as to whether Mr. Parry made those comments. *Compare Decl. of Michael S. Parry* (ECF No. 59), *with Pl.'s Resps. to Interrogs.* at 5. Viewing the facts most favorable to the non-movant, the Court accepts Mr. LaBrecque's version of the facts as true.

However, as to the statement that no action was taken, there is a potential conflict between Mr. LaBrecque's answers to interrogatories and his deposition testimony. In his answers to interrogatories, Mr. LaBrecque says that he emailed Mr. Kunz, but no action was taken. *Pl.'s Resps. to Interrogs.* at 5. However, during his deposition, Mr. LaBrecque testified that Mr. Kunz held a meeting. *LaBrecque Dep.* 76:6-25. Where there is a conflict between an affidavit and a deposition, without any explanation, the deposition controls. *See Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4–5 (1st Cir. 1994). Therefore, the Court adjusts the statement to reflect that Mr. Kunz held a meeting, which is consistent with Mr. LaBrecque's testimony, but the Court has also included his assertion that no action was taken beyond the meeting because a meeting alone without more may not be considered to be "action."

In August 2011, one of Mr. LaBrecque's direct reports, Ryan Cincotta, accused him of engaging in inappropriate behavior that included masturbating in the engine spaces of a submarine (the Cincotta allegations). DSMF ¶ 26; PRDSMF ¶ 26; PSAMF ¶ 7; DRPSAMF ¶ 7.[15]   Mr. Cincotta made these allegations shortly after Mr.

---

[15]     Mr. LaBrecque also seeks to include in paragraph seven this statement:

> Three members of Plaintiff's team in particular, Ryan Cincotta, Kathryn Hook, and Dolly Saucier-Decatur, were especially resentful that Plaintiff had been promoted as a result of the EEO process, and because he insisted that the Shipyard leave request protocols be followed.

PSAMF ¶ 7.  The Navy requests to strike this portion of the statement because, it argues, it is unsupported by the record citation and relies on Mr. LaBrecque's conclusory and speculative statements.  DRPSAMF ¶ 7.  The Navy also denies the statement because it argues that the cited material contains particularized factual assertions which tend to prove that the employees' motive for complaining was not retaliation but frustration that Mr. LaBrecque had denied their leave requests and counseled them for not following the appropriate leave request protocol.  *Id.*

Whether Mr. Cincotta and his coworkers made these allegations because of Mr. LaBrecque's EEO complaints is an important issue in Mr. LaBrecque's case.  If the Cincotta allegations were related to his EEO complaints, there is at least a causal string between the EEO complaints and the Navy's actions in response to the Cincotta allegations.  Recognizing the potential significance to Mr. LaBrecque, the Court has undertaken a detailed analysis of Mr. LaBrecque's record support for his assertion.

After analysis, the Court agrees with the Navy that the statement that the employees were resentful that Mr. LaBrecque had been promoted as a result of the EEO process is unsupported speculation.  To support his assertion about the motives of Mr. Cincotta, Ms. Hook and Ms. Saucier-Decatur, Mr. LaBrecque cites the following: Joint Record, Ex. A-1 at Kunz 7, Plaintiff's Interrogatory Responses pages 5-6.  PSAMF ¶ 7.  As indicated, Kunz Exhibit 7 is a set of Mr. LaBrecque's own interrogatory answers.  *Pl.'s Resps. to Interrogs.*  Specifically, Mr. LaBrecque cites pages five and six of his interrogatory answers.  *Id.*  The question to which pages five and six respond is a general contention interrogatory, asking Mr. LaBrecque to identify instances where he was subjected to retaliatory behavior as a result of his EEO claim.  *Id.* at 3.

At pages five and six, Mr. LaBrecque states that Ryan Cincotta, Kathryn Hook, and Dolly Saucier-Decatur "were especially resentful of my new supervisory role."  *Id.* at 5.  He points to three instances to support this assertion: (1) that Ms. Hook sent him "an inappropriate request for annual leave via text message" and after consulting his supervisors, he denied her request, (2) that he counseled Ms. Saucier-Decatur and Mr. Cincotta for failing to report to work in violation of the no call/no show policy, and (3) he had received an email from his foreman instructing him to muster his team, but he could not do so because Ms. Saucier-Decatur, Ms. Hook and Mr. Cincotta had left work early, causing Mr. LaBrecque to receive a Letter of Caution.  *Id.* at 5–6.  Viewed in the light most favorable to Mr. LaBrecque, these instances demonstrate some, though limited, degree of tension between Mr. LaBrecque's role as supervisor and three of his supervisees (though the Court views these instances as unremarkable interactions).  What is still missing is any correlation between his EEO complaint and these three instances.  Mr. LaBrecque points to no comments by any of these three supervisees about his EEO complaint, no evidence that these three supervisees were denied promotion because of his EEO complaint, and no reason related to his EEO complaint that Mr. Cincotta and his coworkers would concoct such a scurrilous allegation against him.

LaBrecque counseled him, and two other employees, Kathryn Hook and Dolly Saucier-Decatur, regarding the Shipyard's leave request protocol. *Id.* Mr. Cincotta's allegations of sexual misconduct were false and unfounded. PSAMF ¶ 7; DRPSAMF ¶ 7.[16] Mr. LaBrecque was extremely upset, and immediately submitted a voluntary statement and declaration under oath in which he adamantly denied the accusations. *Id.* Guy Drapeau, a Shipyard official one level above Mr. Kunz, investigated the Cincotta allegations in August 2011. DSMF ¶ 27; PRDSMF ¶ 27.[17] After reviewing the Report of Investigation (ROI), Mr. Kunz concluded that the allegations could not be substantiated and informed Mr. LaBrecque that no adverse action would be taken against him. DSMF ¶ 28; PRDSMF ¶ 28; PSAMF ¶ 8; DRPSAMF ¶ 8.

---

By contrast, Mr. LaBrecque himself offers an alternative motive for the Cincotta allegation, namely that Mr. LaBrecque denied a request for annual leave and counseled two of them for failure to report to work in violation of policy. PSAMF ¶ 7; *Pl.'s Resps. to Interrogs.* at 5–6. Whatever else might be said about the notion that these three workers would make up a false allegation of sexual misconduct for these reasons, there is no evidence that these motives, if true, had anything to do with Mr. LaBrecque's EEO complaint.

The Court is left with Mr. LaBrecque's own instinctive belief about what these three workers were thinking when they participated in the Cincotta allegations. Mr. LaBrecque's impressions of the unstated motivations of his subordinates are not of evidentiary quality and the Court has therefore not considered them. The Court need not credit "conclusory allegations, improbable inferences, and unsupported speculation," *Lopez-Carrasquillo*, 230 F.3d at 413, and therefore the Court sustains the Navy's objection and excises the statement that the employees were resentful of the promotion and use of the EEO process. The Court also revises the statement to reflect the fact that Mr. Cincotta made the allegations shortly after the leave request protocol discussion.

[16] The Navy denies the portion of the statement in paragraph seven that reads that Mr. Cincotta's complaint was "false and unfounded." DRPSAMF ¶ 7. Mr. LaBrecque cites his answers to interrogatories at pages five and six as support for his assertion. PSAMF ¶ 7. In his answers, he denies the Cincotta allegations and says they were "fraudulent and false." *Pl.'s Resps. to Interrogs.* at 5–7. The Court is obligated to view conflicting evidence in the light most favorable to the non-movant and the Court therefore accepts Mr. LaBrecque's denial as the only way for him to disprove that something he did not do, in fact did not occur. Assuming the sexual misconduct that formed the basis of Mr. Cincotta's accusation against Mr. LaBrecque did not occur, it follows that it can properly be characterized as false and unfounded.

[17] Mr. LaBrecque objects to and qualifies this statement. He argues that the statement that Mr. Drapeau investigated the allegations on August 25, 2011 is not supported by the record citation because the citation does not indicate the exact date the investigation was initiated. The Court agrees, *see Kunz Dep.* 33:21-25, and accepts Mr. LaBrecque's qualification that Mr. Drapeau investigated the allegations in August 2011, which is supported by the record. *See Pl.'s Resps. to Interrogs.* at 7.

Mr. LaBrecque, still upset, informed Mr. Kunz that he wanted to file a complaint against Mr. Cincotta due to the fraudulent and false nature of his allegations, and because he wanted management to conduct an investigation into Mr. Cincotta, Ms. Hook, and Ms. Saucier-Decautur's untrue and defamatory allegations. PSAMF ¶ 8; DRPSAMF ¶ 8.  He informed Mr. Kunz that he believed they made their untrue allegations because he had disciplined them for failing to follow Shipyard leave protocol, and because they resented him for receiving an assignment to Acting Supervisor as a result of the EEO proceeding.  *Id.*[18]  Mr. Kunz dissuaded Mr. LaBrecque from filing a complaint, stating that "things were too crazy in the department" at the time.  PSAMF ¶ 9; DRPSAMF ¶ 9.[19]  Mr. Kunz assured Mr. LaBrecque he would no longer have to work with Mr. Cincotta, Ms. Hook, or Ms. Saucier-Decatur.  DSMF ¶ 29; PRDSMF ¶ 29; PSAMF ¶ 9; DRPSAMF ¶ 9.[20]

---

[18]      The Navy qualifies in part and denies this statement.  It argues that Mr. LaBrecque told Mr. Kunz only that he wanted to file "charges against [the employees] for harassment" and the Navy denies that Mr. LaBrecque told Mr. Kunz he believed the employees resented him for receiving an assignment using the EEO process.  DRPSAMF ¶ 8 (citing *LaBrecque Dep.* 62:5-7).  The Court rejects this qualification and denial.  Mr. LaBrecque did testify that he said he wanted to file charges against the three for harassment, but that statement does not conflict with his statements in the responses to interrogatories, which the Court interprets as providing more detail about what he told Mr. Kunz during that conversation.  *See Pl.'s Resps. to Interrogs.* at 7–8.

[19]      The Navy denies the statement that Mr. Kunz said "things were too crazy in the department." DRPSAMF ¶ 9.  It cites the deposition testimony of Mr. Kunz in which he says that he "told Mr. LaBrecque that he could file an EEO process and file a complaint against Mr. Cincotta."  *Kunz Dep.* 34:20-21.  This conflicts with Mr. LaBrecque's version of the events.  *See LaBrecque Dep.* 62:12-15. The Court perceives a genuine dispute of fact and accepts Mr. LaBrecque's statement as true because he is the non-movant.

[20]      Mr. LaBrecque and the Navy offer slightly varying versions of what Mr. Kunz told Mr. LaBrecque about not having to work with Mr. Cincotta, Ms. Hook, or Ms. Saucier-Decatur, and qualify one another's statements.  *See PRDSMF ¶ 29; DRPSAMF ¶ 9.*  Mr. LaBrecque's proposed statement reads: "Mr. Kunz promised him that he would no longer have to work with Mr. Cincotta, Ms. Hook or Ms. Saucier-Decatur," which is supported by his own responses to the Navy's interrogatories.  *See Pl.'s Resps. to Interrogs.* at 8.  The Navy's proposed statement reads: "Mr. Kunz agreed to separate LaBrecque from Mr. Cincotta and from other employees who had provided statements against LaBrecque by assigning LaBrecque to a different submarine than the others."  DSMF ¶ 29.  This statement is supported by Mr. Kunz's testimony.  *See Kunz Dep.* 35:13-36:20.  The Navy also cites Mr. LaBrecque's transcript, in which Mr. LaBrecque states that "[Mr. Kunz] assured me that he would not

16

### D.    Evaluations & Observations of John G.  LaBrecque's Work as a Painter Supervisor

Mr. LaBrecque's mid-year performance evaluation was completed by Thomas Moody on April 21, 2011.  DSMF ¶ 24; PRDSMF ¶ 24.[21]  The evaluation indicated that Mr. LaBrecque was "starting out on the right foot as a new supervisor."  *Id.*  Mr. LaBrecque signed and dated his April 2011 performance evaluation, confirming receipt of it.  *Id.*

Mr. LaBrecque's end-of-year performance appraisal was completed by Daniel Kays, the new Shop 71 General Foreman, on November 23, 2011.  DSMF ¶ 30; PRDSMF ¶ 30.  Although it rated Mr. LaBrecque's performance as acceptable overall, it noted that Mr. LaBrecque needed to improve in some areas, including the

---

assign me to those people anymore," which actually supports Mr. LaBrecque's own statement.  *See LaBrecque Dep.* 66:2-6.  The Court therefore accepts Mr. LaBrecque's version of the facts as the non-movant.  However, it changes the phrase "promised Mr. LaBrecque" to "assured Mr. LaBrecque" to more accurately reflect the record citation.

    The Navy additionally qualifies the statement, denying that Mr. Kunz made a commitment to keep them separated indefinitely.  DRPSAMF ¶ 9.  It says that Mr. Kunz only informed Mr. LaBrecque that he would keep them separated as long as it was possible, which is supported by Mr. Kunz's testimony.  *See Kunz Dep.* 37:16-18.  This conflicts with Mr. LaBrecque's version of the events.  *See Pl.'s Resps. to Interrogs.* at 8.  The Court accepts Mr. LaBrecque's version as true for purposes of this motion.

[21]    Mr. LaBrecque qualifies this statement which originally said that the mid-year performance evaluation was completed by Roland Hudson, the Code 970 General Foreman at the time.  PRDSMF ¶ 24.  Mr. LaBrecque claims that the performance evaluation was completed by Thomas Moody rather than Mr. Hudson.  *Id.*  He cites his responses to the interrogatories and his own deposition to support this claim.  However, the interrogatory responses are nonresponsive because they deal with the March 2011 evaluation, not the April evaluation.  *See Pl.'s Resps. to Interrogs.* at 9.  Additionally, in Mr. LaBrecque's deposition, he testifies that he is not sure whether Mr. Hudson or Mr. Moody completed the evaluation.  *See LaBrecque Dep.* 89:9-11.

    In support of its statement, the Navy relies on Mr. Kunz's deposition, but Mr. Kunz only testified that the performance evaluation appears to have been completed by Mr. Hudson.  *Kunz Dep.* 25:22-26:1.  He seems to be basing his belief on the signature at the end of the evaluation.  However, Mr. LaBrecque claims that this evaluation was altered as the original signatory's name is covered up and Mr. Hudson's signature is below the actual signature line.  *See J.R.* Attach. 2 *Kunz Ex. 5, Performance Plan* at 3.  The Court agrees that the original signature on the evaluation appears to have been covered up.  However, the last letter of the whited-out signature appears to be a "y" and, based on this observation, the Court concludes that between Mr. Hudson and Mr. Moody, it is more likely that the signature is Mr. Moody's.

thoroughness and completeness of his work, prioritizing his work to meet deadlines, clear and effective written communication, and diffusing or resolving conflicts effectively.   *Id.*   Mr. LaBrecque signed and dated his performance evaluation on November 23, 2011, confirming receipt of it.   *Id.*   Mr. Kays concluded: "If [LaBrecque] keeps up the good work he will do just fine." *Id.*[22]

Additionally, during the time when Mr. LaBrecque worked as a Painter Supervisor, a Code 970 Supervisor Proficiency Coach by the name of Tim Glennon was assigned to help new supervisors throughout Code 970 obtain certain qualifications that were required for the position.   DSMF ¶ 23; PRDSMF ¶ 23.[23]   In

---

[22]    Mr. LaBrecque qualifies this statement:

   Qualified.  Deny that Mr. Kays observed the Plaintiff such that he was able to evaluate him, or that completing such evaluations was part of his job responsibilities.  Prior to the Plaintiff engaging in protected activity, his project managers, first Mr. Ricker and then Mr. Moody, completed his evaluations.

PRDSMF ¶ 30.  He cites Mr. Crosby's testimony again, which stands for the general proposition that General Foremen did not complete evaluations before 2011 and were not on the boat.  *Crosby Dep.* 51:13-52:13.  The Court has already addressed and included this qualification.  *See supra* note 2.

[23]    Mr. LaBrecque qualifies paragraph twenty-three:

   Qualified.  Mr. Glennon was not assigned to "work with" the Plaintiff; his role was to aid with the supervisors obtaining the appropriate qualifications.  Mr. Glennon never coached Mr. LaBrecque on how to be a better supervisor.  Further, Mr. Glennon testified that the only time he would have worked with the Plaintiff would have been on the first shift.  Mr. LaBrecque worked second shift.

PRDSMF ¶ 23.

   As to Mr. LaBrecque's first point, the Court agrees that the record citation does not support the statement that Mr. Glennon was assigned to work specifically with Mr. LaBrecque and revises the statement accordingly.  *See J.R.* Attach. 5 *Dep. of Timothy Glennon* 12:21-13:11.

   As to Mr. LaBrecque's second point about Mr. Glennon not coaching him on how to be a better supervisor, the Court disagrees.  Mr. LaBrecque testified that Mr. Glennon did give him pointers about how to handle his crew and advice about "step-tracking and packages," processes which were new to him.  *LaBrecque Dep.* 112:16-113:23.  The Court rejects this qualification.

   The Court finds Mr. LaBrecque's final point about working the second shift to be frivolous.  Mr. LaBrecque is not denying that Mr. Glennon ever talked to him or observed him.  In fact, he testifies to the opposite.  Therefore, whether the observations happened on the first or second shift is irrelevant.

his role as Supervisor Proficiency Coach, Mr. Glennon had the opportunity to observe Mr. LaBrecque's work as a supervisor.  DSMF ¶ 23; PRDSMF ¶ 23.

**E.    John G. LaBrecque's Second Promotion to Supervisor Effective November 12, 2011 & Performance Evaluations**

In October 2011, there was a job posting for a Painter Supervisor that was understood to be Mr. LaBrecque's billet, meaning that he was essentially preselected for the position, in this instance, because of the EEO resolution in February.  PSAMF ¶ 10; DRPSAMF ¶ 10.[24]   Effective November 13, 2011, Mr. Kunz selected Mr. LaBrecque from among several qualified applicants for the competitive promotion, not to exceed November 12, 2016, to Painter Supervisor, working day shifts on the deactivation boat, the USS Memphis.  DSMF ¶ 31; PRDSMF ¶ 31; PSAMF ¶ 10; DRPSAMF ¶ 10.

In the spring of 2012, Mr. Kays, the Shop General Foreman, gave Mr. LaBrecque a disappointing performance appraisal.  PSAMF ¶ 11; DRPSAMF ¶ 11; DSMF ¶ 32; PRDSMF ¶ 32.[25]   It noted that Mr. LaBrecque "needs to become more precise while reviewing work before starting & while cowering TWDs [technical work documents]."  DSMF ¶ 32; PRDSMF ¶ 32. "Cowering" refers to reviewing technical

---

[24]    The Navy denies that the term billet refers to a position for which one is preselected and denies that Mr. LaBrecque was preselected for the supervisory position.  DRPSAMF ¶ 10.  It cites Mr. Kunz's testimony, in which he testifies that a billet is "a job vacancy."  *Kunz Dep.* 47:6-7.  Mr. LaBrecque on the other hand, states that the term billet means that he was preselected for the position.  *Pl.'s Resps. to Interrogs.* at 8.  Mr. Kunz acknowledges in his deposition that if a person is on the personnel list of qualified applicants, they are "possibly" likely to get the job and that people refer to the list as "that's so-and so's billet."  *Kunz Dep.* 47:10-48:5.  Given the dispute over exactly what the term "billet" means, the Court accepts Mr. LaBrecque's version as he is the nonmovant.

[25]    Mr. LaBrecque qualifies this statement: "Admit that the document speaks for itself, deny that Kays had the knowledge to make such assertions."  PRDSMF ¶ 32.  The Court has already addressed whether General Foremen are qualified to complete performance evaluations.  *See supra* note 2.

work documents, which give instructions to the mechanics, and ensuring that they contain all required certifications validating that all work has been completed within prescribed standards. *Id.* The mid-year performance appraisal also noted that "more tours need to be performed on the project, they also need to be more thorough." *Id.* It stated that "[LaBrecque] needs to improve before the final year review." *Id.* Mr. LaBrecque signed and dated his 2012 mid-year performance appraisal on April 20, 2012, confirming receipt of it. *Id.*[26]

When asked, Mr. Kays told Mr. LaBrecque that he had not contacted anyone for information regarding Mr. LaBrecque's work performance. PSAMF ¶ 11; DRPSAMF ¶ 11.[27] The Project Manager for the boat, Daniel Bolduc, confirmed that

---

[26]     Mr. LaBrecque also seeks to include statements that:

> By way of contrast, Plaintiff's evaluation in the spring of 2011, which was a good evaluation, was done by Thomas Moody, the Project Manager on the "752 boat" or the Helena where he had been working. The only individuals who can evaluate the quality of the Plaintiff's work or that of his crew are the individuals in charge of the boats, not the supervisor back in the shop.

PSAMF ¶ 12. The Navy requests to strike and denies this statement on several grounds. DRPSAMF ¶ 12. Specifically, it argues that Mr. LaBrecque is not competent to provide the opinion that the only individuals that can evaluate his work are the individuals in charge of the boat. *Id.*

Mr. LaBrecque's first statement about the 2011 evaluation are already reflected in the record. *See* DSMF ¶ 24. As to the second statement about who is qualified to evaluate the quality of Mr. LaBrecque's work, the Court has adjusted the statement to clarify that it represents Mr. LaBrecque's personal opinion, not an objective fact.

[27]     The Navy admits that Mr. Kays did not affirmatively contact anyone for the purposes of obtaining input regarding Mr. LaBrecque's performance but denies that Mr. Kays did not receive information regarding his performance. DRPSAMF ¶ 11. The Court interprets Mr. LaBrecque's statement as limited to whether Mr. Kays affirmatively contacted people for information, so the Court rejects the denial as nonresponsive.

The Navy also denies the suggestion that Mr. Kays never toured the boats and could only evaluate Mr. LaBrecque's performance by physically visiting the boats. In support of its statement that Mr. Kays toured the boats, it cites the declaration of a Zone Manager on the USS MIAMI, the boat to which Mr. LaBrecque was assigned. DRPSAMF Attach. 2 *Decl. of Robert W. Moors* ¶ 6. This statement conflicts with Mr. LaBrecque's statement that he did not believe Mr. Kays ever went on the boat. *Pl.'s Resps. to Interrogs.* at 9. Even if the Court accepts Mr. LaBrecque's statement that he never observed Mr. Kays on the boat, this could not mean that Mr. Kays never actually went on the boat.

he had not been contacted by Mr. Kays about Mr. LaBrecque's work. *Id.* Mr. LaBrecque never observed Mr. Kays on the boat. *Id.* Mr. LaBrecque believes that the only individuals who can evaluate the quality of his work or that of his crew are the individuals in charge of the boats, not the supervisor back in the shop. PSAMF ¶ 12; DRPSAMF ¶ 12.

### F.   John G.   LaBrecque's Assignment to Projects with Ryan Cincotta & Dolly Saucier-Decatur

In July 2012, Mr. Kays told Mr. LaBrecque that he was going to be reassigned to the 752 project (USS Pasadena). DSMF ¶ 33; PRDSMF ¶ 33; PSAMF ¶ 13; DRPSAMF ¶ 13. Mr. Cincotta and Ms. Saucier-Decatur were also assigned to that project. *Id.* Mr. LaBrecque was unhappy about this reassignment because it would have required him to supervise Mr. Cincotta and Ms. Saucier-Decatur. DSMF ¶ 34; PRDSMF ¶ 34. Mr. LaBrecque told Mr. Kays that Mr. Kunz had promised him he would not have to work with either of them given their history of unsupported allegations. DSMF ¶ 34; PRDSMF ¶ 34; PSAMF ¶ 13; DRPSAMF ¶ 13.[28] After Mr. Kunz became aware that the reassignment would have required Mr. LaBrecque to work with Mr. Cincotta and Ms. Saucier-Decatur, Code 970 management "looked at it to see what [they] could do different and [they] chose a different supervisor" to go

---

Consistent with its obligation to view the record in the light most favorable to Mr. LaBrecque, the Court accepts Mr. LaBrecque's version, that he did not see Mr. Kays on the boat.

[28]     The Navy denies the statement that Mr. Kunz and Mr. LaBrecque had an "agreement" that Mr. LaBrecque would "not have to work with" Mr. Cincotta and Ms. Saucier-Decatur indefinitely. DRPSAMF ¶ 13. First of all, Mr. LaBrecque does not use the language indefinitely. Secondly, the Navy submitted the statement "Mr. LaBrecque told Mr. Kays that Fred Kunz had promised him he would not have to work with either of them, because of their history" in its own statement of undisputed material facts. *See* DSMF ¶ 34. The Court retains the statement.

to the Pasadena project. DSMF ¶ 35; PRDSMF ¶ 35. Pat Parquette was assigned to the 752 ship instead. PSAMF ¶ 13; DRPSAMF ¶ 13.

In September 2012, Mr. Kays told Mr. LaBrecque that he was being reassigned to the 752 project, second shift. DSMF ¶ 36; PRDSMF ¶ 36; PSAMF ¶ 14; DRPSAMF ¶ 14. Mr. LaBrecque explained again why he did not want to work with Mr. Cincotta or Ms. Saucier-Decatur, and was told that Mr. Cincotta and Ms. Saucier-Decatur were being reassigned to a day shift, and that he would not have to work with them. *Id.* A few days later, Mr. LaBrecque was told that management could not force Mr. Cincotta and Ms. Saucier-Decatur to switch from the second shift to a day shift per union rules. *Id.*

Mr. LaBrecque, concerned, spoke with Mr. Kunz, whose reply was that "it was out of his hands" and he "was not going to get involved unless he was forced to." *Id.*[29] Before deciding that Mr. LaBrecque would need to be assigned to the Pasadena project, where Mr. Cincotta and Ms. Saucier-Decatur were assigned, Mr. Kunz had first considered "all [other] supervisor options" to meet the mission needs of the Pasadena project. DSMF ¶ 37; PRDSMF ¶ 37. He ultimately determined that, "there were no other options" because he had "limited supervisors available due to [the need to] support the USS Miami [project]." *Id.*[30]

---

[29]     Mr. LaBrecque qualifies the Navy's original statement in paragraph 36: "Mr. Kunz not only said 'it was out of his hands,' he also said he 'was not going to get involved unless he was forced to.'" PRDSMF ¶ 36. The record supports this qualification and the Court includes it above. *See Pl.'s Resps. to Interrogs.* at 10.
[30]     Mr. LaBrecque qualifies this statement:

> Plaintiff admits that Kunz claims to have considered all other supervisor options, but denies that there 'were no other options' available to Kunz other than placing Plaintiff in a 'hostile work environment' with individuals who had falsely accused him of sexual

  
### G.     John G.  LaBrecque's Contact with EEO Counselor Terry Burk in September 2012

On September 24, 2012, after it became apparent that Mr. Kunz was not going to follow through with their agreement, Mr. LaBrecque visited an EEO Counselor by the name of Terry Burk to ask for his assistance about the decision to have him supervise Mr. Cincotta and Ms. Saucier-Decatur.  DSMF ¶ 38; PRDSMF ¶ 38; PSAMF ¶ 15; DRPSAMF ¶ 15.[31]  Mr. LaBrecque believed that having to supervise Mr. Cincotta and Ms. Saucier-Decatur would put him in a "hostile work environment," because of the nature of Mr. Cincotta's allegations in 2011, which he described as "allegations of Sexual Mis-Conduct [sic]."  DSMF ¶ 38; PRDSMF ¶ 38.[32] He also believed that having to supervise Mr. Cincotta and Ms. Saucier-Decatur would be a violation of the 2011 agreement that he would not have to work with them. *Id.*  When he met with Mr. Burk, Mr. LaBrecque explicitly stated that he was not there to file an EEO complaint.  DSMF ¶ 39; PRDSMF ¶ 39.  Mr. Burk told Mr. LaBrecque to speak with Mr. Kunz.  PSAMF ¶ 15; DRPSAMF ¶ 15.

---

misconduct and sexual assault in violation of the October 2011 agreement that he would not have to work with them.

PRDSMF ¶ 37.  The Court rejects this qualification.  First of all, to the extent the statement uses such phrases as "hostile work environment" and "in violation of the October 2011 agreement," these are legal conclusions, not properly presented in the opposing statement of facts.  *See* D. ME. LOC. R. 56(c). More significantly, the qualification is not supported by the record citations, which say nothing about whether other options were available for Mr. Kunz to assign Mr. LaBrecque elsewhere.  *See Pl.'s Resps. to Interrogs.* at 10; *LaBrecque Dep.* 142:17-19, 143:2-23.

[31]     The Navy qualifies the portion of the statement dealing with the agreement to explain that the Mr. Kunz had only agreed to keep Mr. LaBrecque separated from these employees as long as it was possible.  The Court has already addressed this issue.  *See supra* note 20.

[32]     Mr. LaBrecque qualifies this statement to include that he "also believed that having to supervise Mr. Cincotta and Ms. Saucier-Decatur would be a violation of the 2011 agreement that he would not have to work with them."  PRDSMF ¶ 38.  The record evidence supports this qualification, *Pl.'s Resps. to Interrogs.* at 10, and the Court so qualifies.

Mr. LaBrecque met with Mr. Kunz and Chuck McDonald later that same day. DSMF ¶ 40; PRDSMF ¶ 40; PSAMF ¶ 16; DRPSAMF ¶ 16. After Mr. LaBrecque explained why he was uncomfortable with an assignment on the 752, Mr. Kunz replied that he needed to report to the project or "turn his hat in." *Id.* The term "hat" was common parlance on the Shipyard for a supervisory position, and "turning" one's "hat in" meant giving up one's supervisory position. DSMF ¶ 40; PRDSMF ¶ 40.

Mr. LaBrecque relayed this conversation to Mr. Burk, the EEO counselor, who told him that Mr. Kunz had called him in April 2012 and told him that he wanted to get rid of Mr. LaBrecque because of how he obtained his position. PSAMF ¶ 19; DRPSAMF ¶ 19.[33] Mr. Burk then instructed Mr. LaBrecque to speak with Head of Code 900 Production, Guy Drapeau. *Id.* Mr. LaBrecque spoke with Mr. Drapeau, who indicated that he had absolutely no idea that Mr. LaBrecque would not have to work with Mr. Cincotta or Ms. Saucier-Decatur. *Id.*[34]

---

[33]    The Navy denies this statement. It cites Mr. Burk's deposition testimony in which he denies that the conversation ever happened. DRPSAMF ¶ 19 (citing *Burk Dep.* 46:8-48:8). Additionally, the Navy argues that the assertion is absurd in light of the fact that Mr. Kunz promoted him twice. *Id.*
    The Court has qualms about admitting Mr. LaBrecque's statements regarding the content of two other individuals' conversation allegedly relayed to him by Mr. Burk. First, the conversation raises double hearsay concerns, albeit admissible because both statements are opposing party statements made by the party's employees. FED. R. EVID. 801(d)(2)(D). Second, Mr. Burk himself denies the conversation, explaining that he "would not have had that kind of conversation with a manager." *Burk Dep.* 47:4-18. However, because the Court must view the facts in a light most favorable to the nonmovant, and because it is possible that Mr. Burk did tell Mr. LaBrecque that Mr. Kunz made those statements, the Court will include Mr. LaBrecque's version of the conversation for purposes of this motion.
[34]    The Navy objects to a portion of this statement that originally stated that Mr. Drapeau had no "idea as to what had been going on regarding the Cincotta allegations [or] any alleged resulting investigation" because, it argues, Mr. Drapeau ordered the investigation. DRPSAMF ¶ 19. The Court agrees with this objection as Mr. LaBrecque already admitted to the fact that Mr. Drapeau ordered the investigation. *See* PRDSMF ¶ 27. Therefore, the Court excises this portion of the statement.

Mr. Burk contacted Mr. Kunz directly and had an in-person meeting with him in Mr. Burk's EEO office on the next day, September 25, 2012, where Mr. LaBrecque was discussed.  PSAMF ¶ 17; DRPSAMF ¶ 17.  Later that day, Mr. Kays informed Mr. LaBrecque that Mr. Cincotta and Ms. Saucier-Decatur were in fact moving to the third shift.  DSMF ¶ 41; PRDSMF ¶ 41.[35]  Mr. Kays also told Mr. LaBrecque that his meeting had "pissed" Mr. Kunz off.  PSAMF ¶ 20; DRPSAMF ¶ 20.  A few weeks after the September meeting, Mr. LaBrecque received a text message warning from Mr. Kays that stated: "You better watch you (sic) self get it together."  *Id.*

### H.   John G. LaBrecque's Negative Evaluation & Demotion to Worker Leader

Beginning in September 2012, Mr. Kays was serving both as the Shop 71 General Foreman and as a Zone Manager on the Pasadena project, to which Mr. LaBrecque had been assigned.  DSMF ¶ 42; PRDSMF ¶ 42.  Mr. LaBrecque's performance evaluation indicates that on Friday, September 28, 2012, Mr. Kays discovered that two tasks that had been assigned to Mr. LaBrecque's team the night before, including the task that had been prioritized as "Number 1," had not been completed, despite the fact that Mr. LaBrecque had indicated on his "turnover" sheet that the work was done.  DSMF ¶ 43; PRDSMF ¶ 43.[36]  The evaluation indicates that

---

[35]     Mr. LaBrecque denies this statement, which originally said that it was Mr. Kunz who informed him that Mr. Cincotta and Ms. Saucier-Decatur were moving shifts.  PRDSMF ¶ 41.  The record supports that it was Mr. Kays who said the two would be moving and the Court adjusts the statement accordingly.  *See Pl.'s Resps. to Interrogs.* at 10.

[36]     Mr. LaBrecque both objects to and denies this statement.  He objects on the grounds that the assertion is not supported by the reference record citation because "[t]he referenced exhibit was made on November 28, 2012, two months after the alleged incomplete tasks."  PRDSMF ¶ 43.  He further objects because he argues that Mr. Kays had no personal knowledge to substantiate the allegations in the document.  *Id.*  The Court disagrees.  Although the referenced exhibit was prepared on November 28, 2012, *see J.R.* Attach. 3 *Tr. of Dep. of Daniel P. Kays* 29:14-19 (*Kays Dep.*), the evaluation states

Mr. LaBrecque's failure to complete these tasks during his shift required that the day shift complete the unfinished work, on top of their regular workload. *Id.* The evaluation also indicates that between October 1, 2012 and October 12, 2012, Mr. Kays discovered eight additional instances in which work that had been assigned to Mr. LaBrecque was performed incorrectly or incompletely, resulting in delays, cost overruns, and additional work for the day shift to complete. DSMF ¶ 44; PRDSMF ¶ 44.[37] The records indicate that in most of these instances, his turnover sheet inaccurately stated that the work had been completed. *Id.* However, Mr. LaBrecque denies that his work was incomplete or shabby. *Id.* Additionally, according to Mr. Labrecque, he was not assigned to the Pasadena boat until September 25, 2012, so any delays or cost overruns were already present on the boat when he reported to the Pasadena. *Id.*

On October 12, 2012, after being on the Pasadena for less than three weeks, Mr. Kays told Mr. LaBrecque that he had lost his hat and that starting Monday,

---

that these events occurred on September 28, 2012. *See J.R.* Attach. 2 *Performance Plan* at 6. Additionally, as Mr. LaBrecque admitted, Mr. Kays was serving as a Zone Manager at the time and therefore had personal knowledge of Mr. LaBrecque's work. *See* PRDSMF ¶ 42. Mr. LaBrecque's objections go to weight, not admissibility.

     Mr. Labrecque denies the statement because he contends that his work was not incomplete or shabby. He cites his deposition testimony, in which he testifies that his work was performed perfectly and that he did not sign the evaluation because he did not agree with it. *See LaBreque Dep.* 161-168.

     Presented with contrasting accounts of the quality of the work on September 28, 2012, the Court perceives a genuine dispute of fact regarding whether Mr. LaBrecque's work was incomplete on that day. Charged as it is to view the facts in Mr. LaBrecque's favor as the nonmovant, the Court includes the caveat that this fact is based on the written evaluation but that Mr. LaBrecque disagrees with the evaluation.

[37]      Mr. LaBrecque objects to and denies this statement for the reasons stated in his response to paragraph 43. PRDSMF ¶ 44. He also argues that he was not assigned to the Pasadena boat until September 25, 2012 so "any delays or cost overruns were already present on the boat when he reported to the Pasadena." *Id.* The Court already qualified the statement to explain that Mr. Labrecque disagrees that his work was incomplete or shabby. *See supra* note 36. The Court additionally adds Mr. LaBrecque's statement about the cost overruns and delays, as it is supported by the record. *See LaBrecque Dep.* at 165:9-14.

October 15, he would be assigned to the Miami on day shifts as a Worker Leader, reporting to Rikki Nesbitt.  PSAMF ¶ 21; DRPSAMF ¶ 21; DSMF ¶ 45; PRDSMF ¶ 45.  The decision to return Mr. LaBrecque to his permanent Painter Leader position was made by Mr. Kunz, allegedly based on input he received from Mr. Kays regarding Mr. LaBrecque's performance as a supervisor.  DSMF ¶ 48; PRDSMF ¶ 48.[38]  Mr. LaBrecque believed that he was demoted because Mr. Kunz was "pissed off" that he had gone to the EEO to complain.  *Id.*  The change was not made effective until October 28, 2012.  DSMF ¶ 45; PRDSMF ¶ 45.

## I.    John G.  LaBrecque's Assignment to the Mock-Up Facility

The week after Mr. Kays notified Mr. LaBrecque of his demotion, Mr. LaBrecque was told to report to the "mock-up" training facility for new employees, not as a Supervisor, not even as a Worker Leader, but as a mechanic, despite being a Worker Leader since 2004; however, Mr. LaBrecque was paid as a Worker Leader

---

[38]    Mr. LaBrecque qualifies this statement.  He admits that the decision was made by Mr. Kunz but denies that it was based on his performance.  Mr. LaBrecque argues that "it was because he was 'pissed off' that he had gone to EEO to complain about the assignment to work with Mr. Cincotta and Ms. Saucier-Decatur, and then spoke with Mr. MacDonald, Mr. Kays, and Mr. Drapeau about Mr. Kunz's decision."  PRDSMF ¶ 48.  Mr. LaBrecque cites his responses to interrogatories in support of his qualification.  The Court finds that the record supports that it was Mr. LaBrecque's belief that he was being demoted because Mr. Kunz was "pissed off" that he had gone to the EEO to complain.  *See Pl.'s Resps. to Interrogs.* at 9–11.  Furthermore, this belief is reasonable given the statement by Mr. Kays that Mr. Kunz was "pissed off" after Mr. LaBrecque spoke to Mr. Burk on September 24, 2012.  However, Mr. Kunz's own rationale for his decision is relevant to the issue of discrimination, which requires the employer to demonstrate a legitimate, non-discriminatory reason for its actions, so the Court retains the Navy's statements about Mr. Kunz's alleged reasons for the demotion as well.

Mr. LaBrecque further denies that the decision was made based on information from Mr. Glennon because "Mr. Glennon never shared his observations with Mr. Kunz prior to November 2012."  PRDSMF ¶ 48.  The Court agrees that Mr. Glennon admitted that he never had any conversations about Mr. LaBrecque's work prior to November 21, 2012 and thus Mr. Kunz's decision could not have been based on information from Mr. Glennon.  *See J.R. Attach. 5 Tr. of Dep. of Timothy A. Glennon* 35:22-36:2 (*Glennon Dep.*).  Therefore, the Court excises the portion of the statement regarding Mr. Glennon's input.

during this time.  DSMF ¶ 55; PRDSMF ¶ 55; PSAMF ¶ 22; DRPSAMF ¶ 22.[39]  At the facility, he was assigned to sandblast inside a mock-up tank.  DSMF ¶ 55; PRDSMF ¶ 55.

Mr. Kunz was responsible for assigning Mr. LaBrecque to the mock-up facility. DSMF ¶ 56; PRDSMF ¶ 56.  Mr. Kunz says that he assigned Mr. LaBrecque there because he believed he was a skilled painter/blaster and he thought it would be good for the new mechanics to work with him.  *Id.*  In addition, Mr. Kunz says that he was conducting an important time study regarding the amount of time it should take to blast high-solids paint in a ballast tank, and he believed that as an experienced painter/plaster, Mr. LaBrecque was a good person to use for the time study.  *Id.*[40]  Mr.

---

[39]      The Navy denies a portion of Mr. LaBrecque's paragraph 22 that said that Mr. LaBrecque reported to work on October 17 and then was told about the mock-up facility.  DRPSAMF ¶ 22.  The Navy cites the Shipyard's sick leave sheet which states that Mr. LaBrecque received 8 hours of sick leave on October 17.  *Decl. of Shelly Gray* ¶ 4, Ex. A (ECF No. 55) (*Gray Decl.*).  However, the Navy, in its own statement of facts, said that Mr. LaBrecque was told to report to the mock-up facility on October 17, 2012.  DSMF ¶ 55.  It could be the case that Mr. LaBrecque did take sick leave, but was told to report to the mock-up facility over the phone or by some other means.  However, the Court cannot be certain of the facts.  Given the conflict between what the parties say and what the records reflect, the Court changes the statement to say: "The week after Mr. Kays notified Mr. LaBrecque of his demotion."

        The Navy also denies that Mr. LaBrecque was a mechanic and cites Mr. LaBrecque's deposition testimony in which he says that he was not demoted, but paid as a Worker Leader.  *See LaBrecque Dep.* 184:8-13.  The Court concludes that although Mr. LaBrecque was paid as a Worker Leader, he may have been told that he was being demoted to a mechanic, as supported by his responses to interrogatories.  *See Pl.'s Resps. to Interrogs.* at 12.  Therefore, the Court rejects the denial but includes that he was paid as a Worker Leader during this time.

[40]      Mr. LaBrecque qualifies this statement by denying the reasons Mr. Kunz gives for assigning him to the mock-up facility and arguing that he "was sent to the mock up training to humiliate and 'mess' with him and to deny him overtime opportunities."  PRDSMF ¶ 56.  Mr. LaBrecque claims that Mr. Kunz did not assign him because he was a good person to use for the study, given how the study was conducted.  *Id.*

        Mr. Kunz testifies that he sent Mr. LaBrecque to the mock-up facility to be a trainer "[b]ecause he could use his experience and teach the new people the right set of skills."  *Kunz Dep.* 74:12-24.  On the other hand, Mr. Crosby and Mr. LaBrecque state that he was not acting as a trainer, but a trainee and that this position does not get priority for overtime opportunities.  *See Crosby Dep.* 67:25-70:4; *Pl.'s Resps. to Interrogs.* at 12.

        Although Mr. LaBrecque cannot know for certain Mr. Kunz's motives, given the facts that Mr. Kunz was allegedly "pissed off" after Mr. LaBrecque's meeting with Mr. Burk, *see* PSAMF ¶ 20;

LaBrecque was aware of the time study, and of its importance to the Shipyard; however, he was not aware if he had been assigned to blast in the mock-up training facility as part of the time study.  DSMF ¶ 57; PRDSMF ¶ 57.[41]  Mr. LaBrecque, however, believes that he was sent to the mock-up training facility to humiliate and mess with him and to deny him overtime opportunities because he served as a trainee, not a trainer, while he worked there.  DSMF ¶ 56; PRDSMF ¶ 56.  Mr. LaBrecque left mock-up training before the time study was completed.  DSMF ¶ 57; PRDSMF ¶ 57.

### J.  Further Contact with EEO Counselor Terry Burk & AIG Kevin Brigham in October 2012

After the demotion and assignment to the mock-up facility, Mr. LaBrecque contacted EEO counselor Mr. Burk on October 18, 2012, and had an initial interview with him on October 22, 2012.[42]  PSAMF ¶ 23; DRPSAMF ¶ 23.  On that date, Mr. Burk offered alternative dispute resolution, and Mr. LaBrecque elected to have a mediation which was scheduled for November 15, 2012.  *Id.*  Upon scheduling the

---

DRPSAMF ¶ 20, and recently demoted Mr. LaBrecque, *see* DSMF ¶ 45; PRDSMF ¶ 45, a factfinder could reasonably infer that Mr. Kunz sent Mr. LaBrecque to the mock-up facility with the other trainees in order to humiliate him.  Charged as it is to recount the facts most favorable to Mr. LaBrecque's theory, the Court will qualify the statement to explain Mr. LaBrecque's view of the situation.  However, the Court retains Mr. Kunz's explanation, as it is relevant to the discrimination analysis.

[41]    Mr. LaBrecque denies that he was assigned to the mock-up training as part of the study, referring to his response in paragraph 56.  PRDSMF ¶ 57.  However, the Court rejects this denial as nonresponsive because it does not provide support to contradict the statement that he knew of the time study's importance but was not aware if he had been assigned to a mock-up training.

[42]    Mr. LaBrecque's paragraph twenty-three says that his October 22, 2012 interview with Mr. Burk was his "initial" interview.  PSAMF ¶ 23.  The Court is confused because it has already been established that Mr. LaBrecque previously consulted with Mr. Burk.  *See* DSMF ¶ 38; PRDSMF ¶ 38; PSAMF ¶ 15; DRPSAMF ¶ 15.  Nevertheless, as the Navy admitted the statement, DRPSAMF ¶ 23, the Court included it.  It may be that the parties intended to state that this was Mr. LaBrecque's initial meeting following the September 24, 2012 meeting.

mediation, Mr. Burk notified several personnel, including Mr. Kunz, Mr. Drapeau, and Agency Representative Penny Colomb.  PSAMF ¶ 24; DRPSAMF ¶ 24.

Mr. LaBrecque was under an extreme amount of stress and anxiety at this time and also sought help from an Employee Assistance Program (EAP) counselor who directed him to speak with Kevin Brigham, AIG for the Shipyard.[43]  PSAMF ¶ 25; DRPSAMF ¶ 25.  Mr. Brigham notified Mr. LaBrecque that he was not aware of Mr. Cincotta's allegations, and called Mr. Drapeau to ask him about the location of the ROI.  *Id.*[44]  In response to Mr. Brigham's inquiry as to why the matter was not brought to his attention, especially now that Mr. LaBrecque had lost his hat, Mr. Drapeau stated that he had been told by Mr. Kunz that Mr. LaBrecque had voluntarily returned his hat.  *Id.*  However, Mr. LaBrecque would not have returned his hat, a hat he fought so hard to get.  *Id.*

Joe Brooks, the supervisor of the mock-up building, referring to Mr. LaBrecque's meeting with EAP and Mr. Brigham said, "I am not paying you for

---

[43]    The Court is not familiar with the initials "AIG" in the shipyard context.  Although the Court searched for a definition of these initials in the materials the parties submitted, it could find none. AIG may stand for Assistant Inspector General, but this would be a guess, and the Court does not know if the Shipyard even has an inspector general, much less an assistant.  It would have been helpful to know Mr. Brigham's actual position so that the Court could better assess the significance of the EAP referral to him.

[44]    The Navy requests to strike this statement as hearsay because, it argues, Mr. LaBrecque admits that he was not in the office when the conversation took place.  DRPSAMF ¶ 25 (citing *LaBrecque Dep.* 187:25-188:7).  However, viewing the facts in a light most favorable to the nonmovant, the Court interprets Mr. LaBrecque's statement to be based on what Mr. Brigham allegedly told him about the conversation, which would be admitted as non-hearsay because it is an opposing party's statements made by employees.  *See* FED. R. EVID. 801(d)(2)(D).

The Navy also denies that Mr. Drapeau told Mr. Brigham he did not have a copy of the ROI and did not know where it is.  DRPSAMF ¶ 25.  It cites Mr. LaBrecque's testimony in which he recounts the conversation, as told to him, and says "Mr. Drapeau had informed Kevin that it was on Fred Kunz's desk in Building 18."  *LaBrecque Dep.* 188:2-4.  The Court therefore accepts the denial and removes this portion of the statement.

30

training when you have all of these meetings!"  PSMF ¶ 26; DRPSMF ¶ 26.  Mr.
LaBrecque's pay was then docked for 3.5 hours for attending these meetings, a
decision that took approximately one year to reverse.  *Id.*[45]

### K.    Assignment to Building 285

Between November 2, 2012 and the end of November 2012, Mr. LaBrecque was
assigned to Building 285, under the supervision of Worker Supervisor Robert Abbott.
DSMF ¶ 58; PRDSMF ¶ 58.  In Building 285, Shop 71 paints and blasts submarine
parts that have been removed from the submarines.  DSMF ¶ 59; PRDSMF ¶ 59.

In or about November 21, 2012, while he was working in Building 285, Mr.
LaBrecque met Mr. Burk and Mr. Berry, the shop steward, to discuss an EEO pre-
complaint.  PSAMF ¶ 27; DRPSAMF ¶ 27.  When Mr. Abbott was told about the
meeting, he said Mr. LaBrecque only had an hour for the meeting.  *Id.*  Mr. Abbott
was informed that the meeting would take as long as necessary.  *Id.*  The meeting
went longer than an hour, past the muster time.  *Id.*  Mr. Abbott then told Mr.
LaBrecque that, because the meeting went too long, Mr. Kays was going to write him
up.  *Id.*  Mr. LaBrecque experienced a significant amount of stress due to the ongoing
harassment, went to the Shipyard clinic and was directed to go home, which he did,
and took three days of sick leave.  *Id.*

### L.    John G.  LaBrecque's Overtime & Sick Leave

---

[45]    The Navy requests to strike a portion of the statement where Mr. LaBrecque characterized
Joe Brooks' statements as retaliation.  DRPSAMF ¶ 26.  The Court agrees that whether Mr. Brooks'
conduct was retaliation is a central disputed issue in this case and not properly presented in the
statement of facts.  The Court excises that portion of the statement.

On October 12, 2012, Mr. LaBrecque worked 0.5 hours of scheduled overtime. DSMF ¶ 46; PRDSMF ¶ 46. The following day, on Saturday October 13, 2012, Mr. LaBrecque worked 8.5 hours of scheduled overtime on the Pasadena to fulfill a commitment he made to work that day. DSMF ¶ 46; PRDSMF ¶ 46; PSAMF ¶ 22; DRPSAMF ¶ 22. Mr. LaBrecque took eight hours of sick the following Monday, Tuesday, and Wednesday, October 15-17, 2012, because he was too upset to work due to his demotion. PSAMF ¶ 22; DRPSAMF ¶ 22.[46] Of the remaining thirteen regular workdays in October 2012, Mr. LaBrecque took annual leave or sick leave for all or part of six of them. DSMF ¶ 47; PRDSMF ¶ 47.

Of the 18 regular workdays between November 2, 2012 and November 30, 2012, Mr. LaBrecque took annual leave or sick leave for nine full days and part of a tenth day. DSMF ¶ 60; PRDSMF ¶ 60. Mr. LaBrecque worked eight hours of scheduled overtime on two Sundays during that time period. *Id.* Mr. LaBrecque had been scheduled to work eight hours of overtime on a third day during that time period, but he called in because he was ill. DSMF ¶ 61; PRDSMF ¶ 61.[47] The Shipyard records reflect that Mr. LaBrecque called in that day because he was tired. *Id.*

---

[46]    The Navy qualifies this statement. It states: "Plaintiff took eight hours of sick leave on Monday, October 15, 2012; eight hours of sick leave on Tuesday, October 16, 2012; eight hours of sick leave on Wednesday, October 17, 2012; and eight hours of sick leave on Friday October 9, 2012." DRPSAMF ¶ 22. These statements are supported by the Shipyard's sick leave records. *Gray Decl.*, Ex. A. Therefore, the Court qualifies the statement.

[47]    Mr. LaBrecque denies the Navy's statement that he told Mr. Abbott he did not want to work because he was "tired." DSMF ¶ 61. He says that he was "unable to come in because, as he told Mr. Abbott, he was ill." PRDSMF ¶ 61. Mr. LaBrecque cites his deposition transcript in which he testifies that on the relevant occasion "I became ill and I did not come in. I did call [Mr. Abbott] and tell him I wasn't coming in." *See LaBrecque Dep.* 210:7-10. The Shipyard's notes, however, state that on November 3, 2012 Mr. LaBrecque called out for overtime "because he was tired." *See J.R.* Attach. 4 *Kays Ex. 27 entitled 11/3/12 Notes.*

**M.     Further Evaluations of John G.  LaBrecque's Performance & the Navy's Rationale for the Demotion**

Mr. Kays completed Mr. LaBrecque's end-of-year performance evaluation on November 20, 2012.  DSMF ¶ 49; PRDSMF ¶ 49.[48]  Mr. Kays noted that Mr. LaBrecque did not meet the goals set for him and discussed at his mid-year performance evaluation.  *Id.*  He noted a failure to "stay focused on the work at hand," an "inability to move production work [forward]" that "caused rework and overcharges on work assignments," and a "lack of leadership" and "worksite visits" that "caused work to be competed over cost and not on schedule."  *Id.*  He also noted Mr. LaBrecque's failure to "be more precise with work overview," as he had been instructed during his mid-year performance evaluation.  *Id.*  Finally, he noted that Mr. LaBrecque's "preparedness for work assignments is unsat[isfactory]."  *Id.*  Mr. LaBrecque refused to sign this performance evaluation and denies the truth of the reports.  *Id.*

In November 2012, Mr. Kays wrote a separate memorandum memorializing some of Mr. LaBrecque's specific performance failures that contributed to the decision to remove him from the Painter Supervisor position.  DSMF ¶ 50; PRDSMF ¶ 50.[49]

        Charged as it is to recount the facts in the light most favorable to Mr. LaBrecque, the Court revises the statement to say that Mr. LaBrecque called in because he was ill, but that the Shipyard's records reflect that Mr. LaBrecque called in because he was tired.

[48]     Mr. LaBrecque qualifies this statement to admit that the document speaks for itself and to deny that Mr. Kays had the knowledge to make such assertions.  PRDSMF ¶ 49.  The Court has already addressed this issue.  *See supra* note 2.

        Mr. LaBrecque further qualifies paragraph 49 by denying that he performed poorly.  PRDSMF ¶ 49.  Faced with contrasting accounts of the quality of Mr. LaBrecque's work, the Court perceives a genuine dispute of fact regarding whether the evaluations accurately reflect Mr. LaBrecque's performance.  Charged as it is to view the facts most favorable to Mr. LaBrecque's theory of the case, the Court retains the statements regarding the notes made by Mr. Kays, but the Court explains that Mr. LaBrecque denies the truth of the reports.

[49]     Mr. LaBrecque seeks to include the statement:

In the memorandum, Mr. Kays prefaced his observations by noting, "These events are examples of his failures in setting expectations, oversight of work, and general leadership needed by a supervisor." *Id.*[50] Mr. Kays' assessment of Mr. LaBrecque's performance was based on feedback he received from other supervisors, from information Mr. LaBrecque reported in his turnover emails, and from Mr. Kays' review of information documenting cost overruns resulting from Mr. LaBrecque's shifts. DSMF ¶ 51; PRDSMF ¶ 51. It was also based on Mr. Kays' firsthand observations of Mr. LaBrecque beginning in late September 2012 when Mr. Kays was temporarily assigned as a Zone Manager on the same project to which Mr. LaBrecque was assigned. *Id.*[51] Mr. Kays says that at the time he prepared Mr. LaBrecque's

---

When Mr. Kays compiled a document regarding Plaintiff's alleged work deficiencies, the first specific instance identified was on September 28, 2012, and the entire list contains only specific incidents occurring between September 28, 2012, and October 12, 2012.

PSAMF ¶ 18.

The Navy denies the statement: "The document, which speaks for itself, references incidents beginning in 'Summer of 2012.'" DRPSAMF ¶ 18. The Court agrees that the document speaks for itself and includes incidents going back to the summer of 2012. *See J.R.* Attach. 2 *Kunz Ex. 13, Mem. re: John LaBrecque*. Therefore, the Court omits Mr. LaBrecque's additional statement in paragraph 18.

[50] Mr. LaBrecque denies "that Mr. Kays' memorandum, which post-dates the demotion decision by a month, contributed to the decision of Kunz to demote Plaintiff." PRDSMF ¶ 50. He refers to his response in paragraph 48 in which he argues that Mr. Kunz made the decision to demote him because he was "pissed off" that Mr. LaBrecque complained to the EEO counselor. *Id.*

The Court rejects Mr. LaBrecque's denial. Although the memorandum post-dates the demotion, the incidents described in the memorandum took place before the demotion and therefore could have contributed to Mr. Kunz's decision. Mr. LaBrecque has the opportunity to demonstrate that this rationale was pre-textual, for example by introducing Mr. Kunz's own statements that might suggest he had other reasons for demoting Mr. LaBrecque, but the appropriate place to do so is in his argument, not in the statement of facts.

[51] Mr. LaBrecque denies paragraph 51. First, he argues that "[b]etween September 2012 and October 2012, weeks after Plaintiff's demotion and reassignment, Kays was not aware of any criticisms regarding Plaintiff's work." PRDSMF ¶ 51. However, the record citation that Mr. LaBrecque provides says only that Mr. Kays did not receive any criticisms from Zone Managers; he does testify that during this time he received information about Mr. LaBrecque from supervisors, both verbally and in the form of turnover reports. *See Kays Dep.* 33:4-36:18. The Court therefore rejects the denial.

performance evaluations in 2011 and 2012, he was unaware that Mr. LaBrecque had

filed an EEO complaint in January of 2011. DSMF ¶ 52; PRDSMF ¶ 52.[52]

On November 21, 2012, Mr. Glennon, the Code 970 Supervisory Proficiency

Coach, also wrote a memorandum memorializing Mr. LaBrecque's performance as a

Painter Supervisor. DSMF ¶ 53; PRDSMF ¶ 53.[53] These included that Mr.

LaBrecque "[f]requently misses details in executing TWD work," and a lack of

understanding regarding requirements for "correcting and transferring data on

[quality assurance] forms," and failure to properly brief jobs to his employees. *Id.* He

summarized that "in order to be an effective Painter/Blaster Supervisor, [LaBrecque]

needs to take ownership of and improve these skills and responsibilities." *Id.* In Mr.

---

Mr. LaBrecque further denies that Mr. Kays had firsthand knowledge of his work performance. However, Mr. LaBrecque admitted that for a time period, Mr. Kays was working as a Zone Manager, *see* PRDSMF ¶ 42, and Mr. Crosby testified that Zone Managers do observe supervisors' work performance. *See Crosby Dep.* 55:20-56:2. Therefore, the Court also rejects this denial.

[52] Mr. LaBrecque denies this statement and says that "[a]fter the March 2011 mediation and resultant promotion, Plaintiff was immediately retaliated against and treated differently by management, including Mr. Kays and his staff, including Michael Parry." PRDSMF ¶ 52. Mr. LaBrecque cites his own responses to the Navy's interrogatories. The portion of the responses that relates to Mr. Kays says that Mr. Kays required him to muster his entire crew at Building 18, instead of at his boat, because one of his crew members left early. *Pl.'s Resps. to Interrogs.* at 4–5. He also says that Mr. Kays gave him a letter of caution on the muster issue. *Id.* at 5.

Although the Court must recount the facts in a light most favorable to Mr. LaBrecque's theory of the case, it has trouble seeing how the fact that Mr. Kays required Mr. LaBrecque to muster his crew at a different location because a crewmember left early refutes Mr. Kays' own sworn statement that he was not aware that Mr. LaBrecque had filed the 2011 EEO Complaint. Therefore, the Court rejects the denial as non-responsive. The Court does, however, add Mr. LaBrecque's statement that he was treated differently by management, including Mr. Kays, after the mediation and resultant promotion. *See* PSAMF ¶ 6.

[53] Mr. LaBrecque both objects to and qualifies this statement. He argues that the assertion is not supported by the referenced citation because "[n]othing in the referenced memorandum indicates that Mr. Glennon observed Plaintiff's performance as a Painter Supervisor." PRDSMF ¶ 53. The Court finds this objection frivolous as Mr. LaBrecque testified that Mr. Glennon gave him advice and pointers. *LaBrecque Dep.* 112:16-113:23; *see also supra* note 23.

Mr. LaBrecque qualifies the statement to deny that Mr. Glennon ever coached and aided him, and further denies that any of his issues were any different than any other supervisors with whom Mr. Glennon had contact. The Court has already addressed the first part of the qualification. *See supra* note 23. As to the second part, the Court finds that the qualification is supported by the record and includes it. *See Glennon Dep.* 36:9-13.

Glennon's view, Mr. LaBrecque's issues were very similar to the issues of the other Supervisors. *Id.* During the time that he worked with Mr. LaBrecque in his capacity as a Supervisor Proficiency Coach, and at the time he prepared his November 2012 memorandum regarding Mr. LaBrecque's performance, Mr. Glennon was unaware that Mr. LaBrecque had engaged in any EEO activity. DSMF ¶ 54; PRDSMF ¶ 54.

### N.    Formal EEO Complaint as of January 2, 2013

Due to the progressively worsening work environment, on January 2, 2013, Mr. LaBrecque filed a formal complaint with the Shipyard EEO office wherein he alleged that he had been discriminated against on the basis of his earlier EEO activity and his age. DSMF ¶ 72; PRDSMF ¶ 72; PSAMF ¶ 31; DRPSAMF ¶ 31.[54] When asked to explain specifically how had had been discriminated against, Mr. LaBrecque wrote:

> After meeting with Fred Kunz on Sept. 24 in regards to the verbal agreement we had about making a certain employee work for me after he accused me of criminal conduct back in 2011, Fred Kunz (Shop Head) tried to make me go back to this employee. After I left meeting I went back to EEO for answers. Fred pulled my hat 2 weeks later for prior EEO involvement.

---

[54]     The Navy qualifies this statement by saying that Mr. LaBrecque filed a complaint with the Shipyard EEO office, not the EEOC. DRPSAMF ¶ 31. The Court accepts this qualification. *See* PRDSMF ¶ 72; *Decl. of Ava Drost* (ECF No. 53).

     The Navy also requests to strike the assertion that he filed the complaint "due to the progressively worsening work environment." DRPSAMF ¶ 31. It argues that the assertion is a legal conclusion and not a statement of fact. *Id.* The Court disagrees. Mr. LaBrecque is not drawing legal conclusions or using conclusory terms such as "retaliation" or "hostile work environment." Additionally, there is evidence that Mr. LaBrecque perceived the work environment to be worsening and was growing anxious and stressed by the events taking place at the Shipyard. *See Pl.'s Resps. to Interrogs.* at 11–15.

DSMF ¶ 72; PRDSMF ¶ 72.  Mr. LaBrecque believes that he has continued to be subject to harassment and retaliation as a result of his EEO complaints.  PSAMF ¶ 32; DRPSAMF ¶ 32. [55]

### O.    John G.  LaBrecque's Work with Rikki Nesbitt

From approximately December 4, 2012 through January 28, 2013, Rikki Nesbitt was Mr. LaBrecque's first-line supervisor on the USS Miami project.  DSMF ¶ 62; PRDSMF ¶ 62.  Ms. Nesbitt became aware that Mr. LaBrecque was involved in EEO activity in January 2013.  DSMF ¶ 63; PRDSMF ¶ 63.[56]

### 1.    Locker Reassignment

On December 16, 2012 Ms. Nesbitt instructed Mr. LaBrecque to move his locker out of the supervisor area because it was connected to a supervisor office area intended for supervisor use only, and Mr. Kays had told her that Mr. LaBrecque was

---

[55]     Mr. LaBrecque seeks to include the additional statement: "Plaintiff has continued to be subject to harassment and retaliation as a result of his EEO complaints."  PSAMF ¶ 32.  The Navy objects arguing that the statement is a legal conclusion and not a statement of fact.  DRPSAMF ¶ 32.  The Court agrees with the Navy and omits the statement as written from the record as in violation of the local rules.  *See* D. ME. LOC. R. 56(d).  However, the Court rephrased the paragraph to clarify that it represents Mr. LaBrecque's perception of continuing problems.  At the same time, Mr. LaBrecque's self-perception of generalized discrimination unanchored to any specific facts is scant evidence of actual discrimination.

[56]     Mr. LaBrecque denies the statement that "Ms. Nesbitt did not become aware that LaBrecque had ever been involved in any EEO activity until February 11, 2013, when EEO counselor Ava Drost first contacted her regarding a new formal EEO complaint LaBrecque filed in January, 2013."  PRDSMF ¶ 63.  He says that "Ms. Nesbitt was aware in January 2013, and likely before, of Plaintiff's EEO complaint."  *Id*.  He cites his own deposition in which he testified that "[o]fficially she knew about it in January" of 2013.  *LaBrecque Dep.* 197:21-25.

Ms. Nesbitt, on the other hand, says that she did not become aware of the EEO complaint until February 11, 2013, when EEO counselor Ava Drost contacted her.  *Decl. of Rikki Nesbitt* ¶ 4 (ECF No. 58) (*Nesbitt Decl.*).

Presented with conflicting accounts of when Ms. Nesbitt found out about the EEO complaint, the Court perceives a genuine dispute of fact.  The Court wonders about the grounds for Mr. LaBrecque's statement that Ms. Nesbitt was aware of the complaint in January 2013 because he provides no other facts to explain how he knew this information.  However, charged as it is to recount the facts most favorable to Mr. LaBrecque's theory for purposes of this motion, the Court will excise the portion of the statement that says Ms. Nesbitt did not become aware until February 11, 2013 and change it to January 2013.

no longer a Worker Leader. DSMF ¶ 64; PRDSMF ¶ 64; PSAMF ¶ 29; DRPSAMF ¶ 29.[57] Many non-supervisors had lockers in the area. PSAMF ¶ 29; DRPSAMF ¶ 29.[58] Ms. Nesbitt told Mr. LaBrecque to move after she noticed that he was in the locker room area while she was having a private conversation with another employee and other supervisory personnel. DSMF ¶ 64; PRDSMF ¶ 64.[59] Mr. LaBrecque had been using this locker since 2004, and was humiliated when he was forced to move into the general population, and anxious and stressed that he now had to share a space with Mr. Cincotta. PSAMF ¶ 29; DRPSAMF ¶ 29.

### 2. Denial of Fill-In Supervisor Positions

The decision that Mr. LaBrecque was no longer a Worker Leader resulted in him losing overtime shifts and being denied fill-in supervisor shifts, shifts that he had for over 7 years. PSAMF ¶ 30; DRPSAMF ¶ 30.[60] Ms. Nesbitt did not assign any

---

[57]    The Navy both qualifies and denies Mr. LaBrecque's statement that Ms. Nesbitt told him he could not be in the locker area because he was no longer a "Worker Leader." DRPSAMF ¶ 29. The Navy states that Ms. Nesbitt did not say he was no longer a Worker Leader but said he was no longer a Supervisor. *Id.* The Navy's qualification and denial is supported by Ms. Nesbitt's declaration. *See Nesbitt Decl.* ¶¶ 5–6.
        On the other hand, Mr. LaBrecque says that she told him he was no longer a Worker Leader, which is supported by his answers to interrogatories. *See Pl.'s Resps. to Interrogs.* at 14. Confronted with a genuine dispute of fact, the Court accepts Mr. LaBrecque's version of the conversation for purposes of the motion because he is the nonmovant.
[58]    The Navy denies this statement. DRPSAMF ¶ 29. It cites the declaration of Ms. Nesbitt, but Ms. Nesbitt never says that there were no non-supervisors in the supervisor locker area. *See Nesbitt Decl.* ¶¶ 5–6. Therefore, the Court rejects the denial as nonresponsive.
[59]    Mr. LaBrecque denies this statement. He says that Ms. Nesbitt told him to move from the locker he had occupied at the direction of Mr. Kays and cites his deposition testimony. PRDSMF ¶ 64. However, Mr. LaBrecque's testimony just says that Ms. Nesbitt told Mr. LaBrecque he was no longer a Worker Leader based on information from Mr. Kays. *See LaBrecque Dep.* 195:17-24. Additionally, Mr. LaBrecque's testimony supports Ms. Nesbitt's statement that she told Mr. LaBrecque he was not supposed to be in the locker room during a conversation she was having with another worker. *Id.* 196:1-14. Therefore, the Court rejects the denial. However, the Court qualifies the statements to explain that Mr. Kays had told Ms. Nesbitt that Mr. LaBrecque was no longer a Worker Leader.
[60]    The Navy requests to strike this statement as speculative and not supported by particularized factual information. DRPSAMF ¶ 30. Specifically, it argues that Mr. LaBrecque "fails to identify even one occasion when this allegedly occurred." *Id.*

of her direct reports "worker leader" duties while she was present because her crew was small enough, approximately 8 mechanics, that she did not need to use a Worker Leader; however, she did assign worker leader duties when she was away.  DSMF ¶ 65; PRDSMF ¶ 65.[61]  For example, when Ms. Nesbitt was away, Chris Marquis, a mechanic with approximately five years of experience, was designated as a Worker Leader in charge, not Mr. LaBrecque.  PSAMF ¶ 28; DRPSAMF ¶ 28.[62]

During the time he reported to her, Ms. Nesbitt considered Mr. LaBrecque's performance to be poor; however, she never communicated any performance concerns to Mr. LaBrecque.  DSMF ¶ 66; PRDSMF ¶ 66.[63]  Based on her observations of his

---

The Court disagrees with the Navy's objection.  Mr. Labrecque provides at least one example of where he did not receive a fill-in position.  He states that on one occasion, another individual, Chris Marquis, was designated as the Worker Leader while Ms. Nesbitt was away.  *Pl.'s Resps. to Interrogs.* at 14.  It is reasonable to infer that had Mr. Kays not told Ms. Nesbitt that Mr. LaBrecque was no longer a Worker Leader, he may have received this fill-in position.

Regarding overtime, the issue is closer.  Although Mr. LaBrecque provides no specific facts to support his statement that he was denied overtime opportunities, he had actually worked for an extended time as a Worker Leader and would be generally aware of the availability for overtime.  This situation is slightly distinct from the case the Navy cites, *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 217–18 (E.D.N.Y. 2014), where the employee's assertion that she was denied overtime based only on "her own belief that this hunch was in fact true."  *Id.* at 218.  It would have been preferable if Mr. LaBrecque had been more specific, but given the Court's obligation to view the evidence in the light most favorable to Mr. LaBrecque, the Court included his statement.

[61]  Mr. LaBrecque denies paragraph 65.  He says that "[w]hen Nesbitt was away, Chris Marquis, a mechanic with approximately 5 years of experience, was designated as a worker leader in charge, not Plaintiff."  DRPSMF ¶ 65.  The record supports Mr. LaBrecque's statement, *see Pl.'s Resps. to Interrogs.* at 14, but the Court does not see how Mr. LaBrecque's statement conflicts with the Navy's statement.  The Navy says that Ms. Nesbitt did not assign worker leader duties when she was *present*.  *See Nesbitt Decl.* ¶ 7.  Mr. LaBrecque's statement says that she did assign worker leader duties when she was *away*.  *Pl.'s Resps. to Interrogs.* at 14.  Therefore, the Court views Mr. LaBrecque's denial as a qualification and adjusts the statement accordingly.

[62]  The Navy qualifies this statement to say that Ms. Nesbitt does not recall whether the need arose for a Worker Leader in her absence but that she probably would not have selected Mr. LaBrecque based on her observations of his performance.  DRPSAMF ¶ 28.  This qualification is already reflected in the record.  *See* DSMF ¶ 66.

[63]  Mr. LaBrecque denies the statement that his performance was poor.  PRDSMF ¶ 66.  He says that "Nesbitt never communicated any performance concerns to the Plaintiff while she was his supervisor."  *Id.*  The record supports Mr. LaBrecque's statement.  *See LaBrecque Dep.* 197:12-20.  However, Mr. LaBrecque's statement does not contradict or conflict with the Navy's statement.  Ms. Nesbitt may have considered Mr. LaBrecque's performance to be poor and never communicated those

poor performance, and the fact that he had been demoted from a supervisor position, Ms. Nesbitt most likely would not have selected Mr. LaBrecque to fill in for her in the event of her absence due to leave or training obligations. *Id.*

### 3.   Questionable Sick Leave Discussion

On January 14, 2013, the Code 970 administrative assistant, Shelly Gray, emailed Mr. Kays and other management officials that a Questionable Sick Leave (QSL) discussion needed to be held with Mr. LaBrecque and eight other Shop 71 employees. DSMF ¶ 67; PRDSMF ¶ 67. That same day, Mr. Kays forwarded Ms. Gray's email to Ms. Nesbitt and other supervisors, instructing them to hold a QSL discussion with anybody on their crews whose names were included on Ms. Gray's email. DSMF ¶ 68; PRDSMF ¶ 68.

Ms. Nesbitt held the QSL discussion with Mr. LaBrecque on January 18, 2013. DSMF ¶ 69; PRDSMF ¶ 69. His union representative was present. *Id.* Mr. LaBrecque was given a form advising him that "if his sick leave balance did not improve, he may be notified in writing . . . that all future requests for sick leave must be supported by a medical certificate and that such notice would not be filed in employee's official personnel file." *Id.*[64] Mr. LaBrecque asserts that he handed

---

thoughts to him. Therefore, the Court views Mr. LaBrecque's denial as a qualification and adjusts the statement accordingly.

[64]     Mr. LaBrecque both objects to and denies this statement. He objects to the statement that the QSL was not disciplinary, claiming that the assertion is not supported by the record citation. PRDSMF ¶ 69. Specifically, he says that nothing in the referenced citation indicates that the QSL was not disciplinary. *Id.* The Court agrees that the fact that the discussion "was not disciplinary" is not supported in the specific record citation provided by the Navy in paragraph 69. *See Nesbitt Decl.* ¶ 9. However, the fact that the QSL is not disciplinary is supported by a record citation provided by the Navy in a later statement of fact. *See DSMF ¶ 74.* Trevor Thayer is the Superintendent of Code 970 and said, in a sworn statement, that a QSL is not disciplinary. *Decl. of Trevor Thayor ¶ 9 (ECF No. 60).* The Court overrules this objection.

doctors' notes over to the main shop between October 2012 and December 2012. DSMF ¶ 70; PRDSMF ¶ 70.

QSL discussions were held when management identified a questionable pattern in an employee's sick leave usage, and/or when an employee's sick leave balance was very low, based on periodic reviews.  DSMF ¶ 70; PRDSMF ¶ 70.[65]  In the two years immediately preceding the date of Mr. LaBrecque's QSL discussion, QSL discussions were held with approximately 88 other Shop 71 employees.  DSMF ¶ 71; PRDSMF ¶ 71.

### P.    Letter of Requirement Regarding Sick Leave

In March 2013, Trevor Thayer replaced Mr. Kunz as the Superintendent for Code 970.  DSMF ¶ 73; PRDSMF ¶ 73.  On July 10, 2013, Mr. Thayer made the decision to give Mr. LaBrecque a Letter of Requirement after a review of his sick leave usage revealed no improvement following the January 18, 2013 QSL discussion.  DSMF ¶ 74; PRDSMF ¶ 74.  It explained that, "from 26 June 2012 through 20 June 2013, [LaBrecque] was granted twenty-one (21) periods of leave for three days or less

---

Mr. LaBrecque also denies the statement arguing that the discussion "was disciplinary and was in retaliation for Plaintiff's EEO activity and resulted in a Letter of Caution in Plaintiff's personnel file which infers an abuse of sick leave."  PRDSMF ¶ 69.  The Court agrees.  Although the QSL discussion may not be "disciplinary" in the sense that it does not have tangible consequences, it could be viewed as a reprimand and may imply an abuse of sick leave.  Therefore, the Court excises the portion of the statement characterizing the discussion as non-disciplinary.

[65]    Mr. LaBrecque qualifies this statement.  He says that QSLs can be held for the reasons stated above but denies that this was the reason for his QSL.  He argues that his QSL "was due to retaliation for prior EEO engagement and his resultant need for sick leave due to the same."  PRDSMF ¶ 70.  The Court finds support in the record that it was Mr. LaBrecque's belief that the QSL was due to retaliation for prior EEO engagement because he had handed over doctors' notes between October 2012 and December 2012.  *LaBrecque Dep.* 200:3-14.  However, whether the discussion fits within the legal definition of retaliation is a central issue to be resolved and therefore asserting a legal conclusion as a fact is not appropriate.  The Court qualifies the statement to include the fact that Mr. LaBrecque asserts that he handed over doctors' notes between October and December 2012.

because of absences claimed as sick leave." *Id.*  The Letter of Requirement informed Mr. LaBrecque that he was now required to provide medical documentation to support his sick leave usage, in accordance with Portsmouth Naval Shipyard Instruction 12630.  DSMF ¶ 74; PRDSMF ¶ 74.[66]

### Q.   Assignment to Work with Ryan Cincotta in 2014

During the summer of 2014, Mike Parry was the Building 18 "shop supervisor" for Shop 71 employees not assigned to a specific project.  DSMF ¶ 75; PRDSMF ¶ 75.  For parts of that time period, Mr. LaBrecque and Mr. Cincotta both reported to Mr. Parry.  *Id.*  Mr. Parry does not recall specific instances but believes it is possible that during certain times, Mr. LaBrecque would have been in the same vicinity as Mr. Cincotta while they both reported to him.  DSMF ¶ 76; PRDSMF ¶ 76.  At that time, Mr. Parry was not aware of any agreement Mr. LaBrecque had made with Mr. Kunz that he would not be required to work in the vicinity of Mr. Cincotta.  DSMF ¶ 77; PRDSMF ¶ 77.[67]  Mr. LaBrecque never brought this concern to Mr. Parry's attention. *Id.*  In March 2015, Mr. LaBrecque made a reasonable accommodation request not to be assigned to a work area that could involve inadvertent contact with Mr. Cincotta

---

[66]     Mr. LaBrecque denies this statement.  *See* discussion *supra* note 64.

[67]     Mr. LaBrecque denies this statement.  He alleges that Mr. Parry was the one who resented that he "was promoted as a result of the 2011 EEO mediation and informed Mr. Cincotta of the same, prompting Mr. Cincotta's false allegations."   DRPSMF ¶ 77.  Mr. LaBrecque cites his deposition testimony in support of his denial.  However, Mr. LaBrecque's testimony only supports the statement that he believed Mr. Parry resented him and "was feeding his information or his hate on [Mr. Cincotta, Ms. Hook, and Ms. Saucier-Decatur]."  *LaBrecque Dep.* 52:19-21.  Mr. Parry very well could have resented him, and fed this information to the others, and still not known about the agreement with Mr. Kunz about separating Mr. LaBrecque and Mr. Cincotta.  Therefore, the Court rejects the denial as nonresponsive.

or Ms. Saucier-Decatur, due to complications related to an anxiety disorder.  DSMF ¶ 79; PRDSMF ¶ 79.  The Shipyard granted that request.  *Id.*

## III.   THE PARTIES' POSITIONS

### A.   The Navy's Motion

In its motion for summary judgment, the Navy notes that Mr. LaBrecque's "single-count retaliation claim is multi-faceted, and complains of both discrete, adverse employment actions and an overall hostile work environment" and therefore states that it is seeking summary judgment on each discrete aspect of Mr. LaBrecque's claim pursuant to Federal Rule of Civil Procedure 56(a).  *Def.'s Mot.* at 16 n.2.

It then begins by arguing that Mr. LaBrecque cannot establish a prima facie case of retaliation based on his demotion in October 2012.  *Id.* at 16.  The Navy concedes that Mr. LaBrecque engaged in ADEA-protected activity when he filed an informal complaint of age discrimination on January 27, 2011, and that the demotion in 2012 was an adverse employment action.  *Id.* at 17.  However, the Navy argues that Mr. LaBrecque has no credible evidence that the 2011 complaint was the "but for" cause of his demotion given the time that has elapsed between the demotion and EEO complaint and the fact that the individual who demoted Mr. LaBrecque was not the subject of the complaint and had previously promoted him.  *Id.* at 17–18.  The Navy goes on to argue that even if Mr. LaBrecque has made out a prima facie case, the Navy has offered a legitimate, non-discriminatory reason for the demotion,

43

namely Mr. LaBrecque's deficient performance, and there is no evidence that those reasons are pretextual. *Id.* at 18–20.

Next, citing caselaw, the Navy argues that Mr. LaBrecque's complaints about the Shipyard's handling of the Cincotta allegations are not protected activity and cannot serve as the basis for an ADEA retaliation claim. *Id.* at 20–21. It adds that Mr. LaBrecque's visit to EEO counselor Terry Burk in September 2012 about Mr. Kunz's unwillingness to honor his promise to keep Mr. LaBrecque away from Mr. Cincotta is also not protected activity and cannot serve as the predicate for his demotion. *Id.* at 21–22.

The Navy then argues that Mr. LaBrecque cannot establish a prima facie case of retaliation based on the alleged acts of harassment in 2013 and 2014, which post-dated his second EEO complaint in January 2013. *Id.* at 22. As a threshold matter, the Navy argues that, with the exception of the alleged denial of overtime opportunities, none of these alleged acts of harassment constitutes "materially adverse employment actions" as required by the ADEA. *Id.* at 23. In addition, the Navy argues that there is no causal connection between his second EEO complaint and any of the acts due to the time gap between the complaint and alleged harassment and the fact that at least one supervisor involved was not aware of the EEO complaint. *Id.* at 25–26. Similarly, with respect to the overtime allegations, the Navy argues that there is no causal connection between the loss of overtime and his EEO complaints due to the remoteness of the acts and the fact that Mr. LaBrecque's supervisor at the time, Ms. Nesbitt, was unaware of the EEO complaint. *Id.* at 26–

44

27.  It adds that there is no evidence that Ms. Nesbitt's proffered reason for not choosing Mr. LaBrecque, his poor performance, was pretextual.  *Id.* at 27.

Finally, the Navy asserts that Mr. LaBrecque cannot establish a prima facie case of hostile work environment.  *Id.*  First, it points out that Mr. LaBrecque's hostile work environment claim is predicated on the very same actions that he contends were acts of discriminatory retaliation and because those acts are not actionable, they cannot form the basis for the hostile work environment claim.  *Id.* at 28.  Second, the Navy says that Mr. LaBrecque mischaracterizes the workplace insults he suffered and argues that they are nothing more than common workplace grievances.  *Id.* at 28–29.  The Navy also argues that Mr. LaBrecque is not entitled to compensatory damages and attorney's fees as a matter of law.  *Id.* at 29–30.

### B.    John G. LaBrecque's Opposition

In opposition, Mr. LaBrecque points out that the Navy concedes that he engaged in ADEA protected activity by filing his January 2011 EEO complaint and that he suffered an adverse personnel action.  *Pl.'s Opp'n* at 13, 14.  He then says that the Navy's arguments that the 2012 visits and complaints to EEO counselor Terry Burk cannot be protected activity under the ADEA are "clearly misguided" and cites cases that support the proposition that informal EEO contacts and complaints are protected activity.  *Id.* at 13–14.

Mr. LaBrecque also argues that there is strong evidence of a causal connection between his EEO complaint and the retaliatory demotion and ongoing retaliation and lists the facts that demonstrate that link.  *Id.* at 14–15.  He asserts that there are

45

sufficient facts from which a trier of fact could conclude that a causal nexus existed and that the Navy's explanation for the demotion is pretext. *Id.* at 15. He adds that "there is a well-settled reluctance of courts to use summary judgment in cases where the recollections, personal accounts, and credibility of witnesses are at issue." *Id.* Mr. LaBrecque argues that for this same reason, his claim based on overtime opportunities should be resolved by a fact-finder. *Id.* at 16 n.3.

Next, Mr. LaBrecque opposes the Navy's argument that he did not establish a prima facie claim of hostile work environment. *Id.* at 16. Citing First Circuit caselaw, Mr. LaBrecque argues that "[t]he conduct of [his] co-workers were not a single incident of harassment; rather, it was a severe and pervasive pattern of hostile and antagonistic behavior that created a hostile work environment." *Id.* at 16–17. He points to the degrading comments from management, his coworkers' resentment, Mr. Cincotta's allegations, and his assignment to the mock-up training facility to support his argument. *Id.* at 17–18. He then states that the United States Supreme Court has explained that whether an environment is hostile is determined by looking at the totality of the circumstances, *id.* at 18 (citing *Harris v. Forklift Sys.*, 510 U.S. 17 (1993)), and that the determination is fact-based and rarely appropriate for summary judgment. *Id.* at 18–19. Mr. LaBrecque also states that he is entitled to seek attorney's fees if he is a prevailing party and should not be prospectively barred from this relief. *Id.* at 19–20.

**C.    The Navy's Reply**

46

In its reply, the Navy states that Mr. LaBrecque refers to his January 2011 EEO Complaint as the "predicate event" underlying his retaliation claim but argues that at no point does he "make any meaningful attempt to link his demotion in October 2012, twenty-one months later, to that so-called 'predicate' event." *Def.'s Reply* at 1. It maintains that Mr. LaBrecque's complaints about working with Mr. Cincotta and Ms. Saucier-Decatur are not protected activity because they had nothing to do with age or any other protected status and therefore, Mr. LaBrecque cannot establish that a protected activity was the but-for cause of his demotion. *Id.* at 1–2, 9–10.

The Navy also argues that Mr. LaBrecque failed to establish that any of the actions taken by management in 2013 and 2014 constituted "adverse employment actions" within the meaning of the ADEA or were causally connected to his protected activity. *Id.* at 3. It also claims that the "various tribulations" about which Mr. LaBrecque complains "were fundamentally too petty and trite to constitute a hostile work environment" and are not causally connected to protected activity. *Id.* at 3, 12.

Next, the Navy argues that Mr. LaBrecque has not created any trial-worthy issues of fact and claims that his purported factual disputes are "based on nothing more than LaBrecque's own conclusory and unsubstantiated speculation about the motivations of co-workers and members of management." *Id.* at 4. It argues that the facts in the record do not support the inference that the demotion or disappointing performance appraisals were motivated by discriminatory animus. *Id.* at 5–8, 10–12. As far as damages, the Navy maintains that Mr. LaBrecque failed to show any

evidence that he suffered actual pecuniary losses and therefore his claims must fail. *Id.* at 12.

## IV. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)). A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once this evidence is supplied by the moving party, the nonmovant must "produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)). In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)). The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011). However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric,

unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

## V.   DISCUSSION

In his single count of retaliation under the ADEA, Mr. LaBrecque alleges that "[t]he Shipyard subjected [him] to multiple acts of intentional and malicious retaliation due to his protected activity, including but not limited to, its malicious threats of discipline, denial of overtime, denial of sick leave, [and] its refusal to accommodate its own agreement that he would not have to work with Mr. Cincotta, Ms. Hook or Ms. Saucier-Decatur." *Am. Compl.* ¶ 58.  He also alleges that the Navy created a hostile work environment.  *Id.*  The Navy moves for judgment on each of Mr. LaBrecque's claims.  *Def.'s Mot.* at 16 n.2.

### A.   Retaliation Claim

The ADEA provides in pertinent part:

> It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment . . . because such individual . . . has opposed any practice made unlawful by this section or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or litigation under this chapter.

29 U.S.C. § 623(d).  Absent direct evidence of retaliation, a plaintiff must make a prima facie showing that "(i) he engaged in ADEA-protected conduct, (ii) he was thereafter subjected to any adverse employment action, and (iii) a causal connection existed between the protected conduct and the adverse action." *Mesnick v. Gen. Elec.*

49

*Co.*, 950 F.2d 816, 827 (1st Cir. 1991). Once a prima facie case is made out, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. *Id.* If this is accomplished, the ultimate burden falls on the plaintiff to show that the employer's proffered reason is pretextual. *Id.* The analytical framework for ADEA discrimination and retaliation cases was patterned after the framework for Title VII cases; the precedent is largely interchangeable. *See Hazel v. U.S. Postmaster Gen.*, 7 F.3d 1, 3–4 (1st Cir. 1993).

### 1.    Mr. LaBrecque's Protected Conduct

As an initial matter, there is a dispute over which of Mr. LaBrecque's complaints constitute "protected conduct" under the ADEA. The Navy does not dispute that the 2011 and 2013 EEO Complaints are protected. The dispute is whether Mr. LaBrecque's informal discussions with the Shipyard's AIG, Mr. Brigham, or with the EEO counselor Mr. Burk constituted new protected conduct.

### a.    Discussion with Kevin Brigham

After Mr. LaBrecque was demoted and assigned to the mock-up facility in October 2012, he sought assistance from Mr. Burk, the EAP counselor, who eventually sent him to the Shipyard AIG Mr. Brigham. Mr. LaBrecque complained to Mr. Brigham about the Shipyard's failure to follow proper protocols in the investigation of the Cincotta allegations. Specifically, he was upset that certain individuals, including Mr. Brigham, were not made aware of the allegations made by Mr. Cincotta, and that he had not received a copy of the ROI, the investigation report. Mr. LaBrecque claims that these "reports of the Shipyard's failure to follow proper

protocols in the investigation of the Cincotta issue" are protected activity.  *Am. Compl.* ¶ 55.

In support of his argument, Mr. LaBrecque points to cases that stand for the proposition that informal complaints are protected.  *Pl.'s Opp'n* at 13–14 (collecting cases).  Mr. LaBrecque is correct that the ADEA's protections extend to informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.  *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009). However, the subject of those informal complaints must still fall within the scope of the ADEA.  *See Ponte v. Steelcase Inc.*, 741 F.3d 310, 322 n.10 (1st Cir. 2014) (rejecting the plaintiff's attempt to characterize a complaint about her manager as "protected conduct" when the complaint itself had nothing to do with any conduct prohibited by Title VII); *see also* 29 U.S.C. § 623(d) ("It shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice *made unlawful by this section*") (emphasis added).

Unlawful practices under the ADEA include discrimination by an employer on the basis of age, as well as retaliation by an employer against any individual who opposes age discrimination.  *See* 29 U.S.C. § 623(a), (d).  At the same time, the ADEA does not protect a complaint of general discrimination or retaliation unrelated to age. *See Burns v. Johnson*, 18 F. Supp. 3d 67, 73 (D. Mass. 2014); *see also Bonds v. Leavitt*, 629 F.3d 369, 384 (4th Cir. 2011) ("Title VII is not a general bad acts statute . . . and

it does not prohibit private employers from retaliating against an employee based on her opposition to discriminatory practices that are outside the scope of Title VII"). To conclude otherwise would mean that an individual could use the ADEA, a statute aimed at eliminating age discrimination, to raise grievances about any type of discrimination.

Mr. LaBrecque's reports to Mr. Brigham have nothing to do with age. He was upset that Mr. Brigham and others were unaware of the Cincotta allegations and that he never got a copy of the investigation report. However, nowhere does Mr. LaBrecque explain how the Shipyard's failure to follow proper protocols in responding to the Cincotta complaints is linked to his age. Therefore, Mr. LaBrecque's complaint to Mr. Brigham cannot serve as new protected conduct to form the basis for a retaliation claim. *See Galouch v. Me. Dep't of Prof'l & Fin. Regulation*, 856 F. Supp. 2d 244, 252 (D. Me. 2012) (citing *Ahanotu v. Mass. Tpk. Auth.*, 466 F. Supp. 2d 378, 395 (D. Mass. 2006) (dismissing Title VII retaliation claim because "reporting on mismanagement and fraud within the Big Dig project" did not constitute protected activity under Title VII)).

### b.   Discussion with Terry Burk

The discussion with Mr. Burk, the Shipyard's EEO officer, is more nuanced. Mr. LaBrecque first consulted Mr. Burk on September 24, 2012, to "ask for his assistance about the decision to have him supervise Mr. Cincotta and Ms. Saucier-Decatur." DSMF ¶ 38; PRDSMF ¶ 38. He believed that working with these employees would put him in a "hostile work environment" and would be a violation

52

of the 2011 agreement that he would not have to work with them. *Id.* At first glance, none of the conduct of which Mr. LaBrecque complained appears to have anything to do with age. At bottom, he was complaining about having to work with two employees who had previously accused him of sexual misconduct, as well as the Navy's failure to abide by an agreement, neither of which is unlawful under the ADEA, an age discrimination statute. *See Ponte*, 741 F.3d at 322 n.10.

In his response, Mr. LaBrecque argues that his discussion with Mr. Burk was a complaint about age-based retaliatory harassment and the toleration of a hostile or abusive work environment, both of which are protected under the ADEA. *See Collazo v. Nicholson*, 535 F.3d 41, 44 (1st Cir. 2008); *Noviello v. City of Boston*, 398 F.3d 76, 91 (1st Cir. 2005). Mr. LaBrecque suggests that Mr. Cincotta's accusations against him were grounded on age-based animus because, he argues, Mr. Cincotta was upset that he was promoted after using the EEO process to complain about age discrimination in 2011. *Pl.'s Opp'n* at 17 ("Several other members of Plaintiff's team were especially resentful about the promotion due to the EEO process as well, and the most striking example is Mr. Cincotta's false and unfounded allegation that Plaintiff had engaged in inappropriate sexual behavior").

There are three problems with Mr. LaBrecque's argument. First, Mr. LaBrecque himself suggests that Mr. Cincotta made these allegations in part because he was upset after Mr. LaBrecque counseled him regarding the sick leave request protocol, which makes sense given the closeness in time between Mr. LaBrecque's talk with Mr. Cincotta about leave requests and Mr. Cincotta's allegations. *See*

PSAMF ¶ 7; DRPSAMF ¶ 7.  This alternative rationale suggests that Mr. LaBrecque's EEO complaint about age discrimination and subsequent promotion was not the but-for cause of Mr. Cincotta's allegations.  *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013) (concluding that a plaintiff must demonstrate that the adverse decision was made because of the protected conduct in order to establish retaliation); *see also Palmquist v. Shinseki*, 689 F.3d 66, 77 (1st Cir. 2012) (rejecting mixed-motive test for causation under the ADEA).

Second, despite the completion of extensive discovery, Mr. LaBrecque's contention that Mr. Cincotta made these false allegations against him because he resented the way Mr. LaBrecque had obtained his supervisory position is based solely on Mr. LaBrecque's own say-so.  *See supra* note 14.  The Court examined the record support for Mr. LaBrecque's assertion and found it wanting.  *Id.*  In short, Mr. LaBrecque provides no other evidence that Mr. Cincotta made these allegations in response to his EEO complaint, other than his own speculation that Mr. Cincotta was resentful of his promotion, but conjecture is not sufficient to defeat a summary judgment motion.  *See Pina v. Children's Place*, 740 F.3d 785, 802 (1st Cir. 2014) ("[J]udges cannot allow conjecture to substitute for the evidence necessary to survive summary judgment"); *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 31 (1st Cir. 2007).

Third, even assuming that Mr. Cincotta did make the allegations in retaliation for Mr. LaBrecque's complaint, Mr. Cincotta is Mr. LaBrecque's coworker, not his supervisor.  In order for the Navy, Mr. LaBrecque's employer, to be liable for another employee's conduct, there must be a showing of negligence on the part of the Navy.

54

*Noviello*, 398 F.3d at 95 ("[A]n employer can only be liable if the harassment is causally connected to some negligence on the employer's part").  In other words, Mr. LaBrecque must show that the Navy "knew or should have known about the harassment, yet failed to take prompt action to stop it."  *Id.*  Although Mr. LaBrecque does not need to show that the Navy was actually in violation of the ADEA for his complaints to be protected, he must demonstrate that he had "a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Fantini*, 557 F.3d at 32 (citation omitted).  Based on this record, the Court cannot conclude that Mr. LaBrecque's belief that the Navy negligently tolerated the harassment by Mr. Cincotta is objectively reasonable.

Mr. Drapeau, a Shipyard official, investigated the Cincotta allegations shortly after they were made and, based on his report, Mr. Kunz determined that the allegations could not be substantiated.  Mr. Kunz then agreed to keep Mr. LaBrecque separated from Mr. Cincotta and from the other employees involved in the allegations.  It was not until one year later, in July 2012, that Mr. LaBrecque was reassigned to a project with Mr. Cincotta and Ms. Saucier-Decatur.  When Mr. LaBrecque complained to Mr. Kays, Mr. Kunz looked for and found another supervisor to go to the project.  When Mr. LaBrecque was again assigned to the same project as Mr. Cincotta in September 2012, Mr. Kunz again considered other options but said that he could not do anything because of union rules.  Ultimately, Mr. Kunz was able to reassign Mr. Cincotta and Ms. Saucier-Decatur to a different shift.  When Mr. LaBrecque ended up working with Mr. Cincotta again in 2014, he filed a request

for reasonable accommodation asking to be separated, which the Shipyard honored.

Based on this record, it is hard to see how these actions could amount to negligence on the Navy's part, or how Mr. LaBrecque could reasonably have believed the Navy was tolerating a hostile work environment. The Navy explained that shifts and projects changed frequently and that union rules constricted its ability to shift people around. In spite of these obstacles, the record confirms that the Shipyard officials did their best to accommodate Mr. LaBrecque's requests over a two-year period. Even after viewing the facts in a light most favorable to Mr. LaBrecque, the Court concludes that any belief that Mr. LaBrecque may have had that his complaint was protected was not reasonable. Therefore, the discussions with Mr. Burk did not constitute new protected activity.

In sum, the Court concludes that Mr. Labrecque engaged in protected activity when he filed an informal EEO complaint in 2011 and a formal EEO complaint in 2013. Therefore, he must demonstrate a causal connection between any of his alleged adverse employment actions and these activities in order to make out a prima facie case of discrimination.

### 2.   October 2012 Demotion

Mr. LaBrecque claims that Mr. Kunz demoted him in October 2012 in retaliation for his informal complaint to the Shipyard's EEO. The Navy does not dispute that Mr. LaBrecque's demotion in 2012 was an adverse employment action. *Def.'s Mot.* at 17. The Navy argues instead that Mr. LaBrecque's prima facie claim fails on the third element because there is no credible evidence that his January 2011

informal EEO complaint was the "but for cause of his demotion nearly two years later." *Id.* The Court agrees that the record reveals no causal connection between the January 2011 complaint and the October 2012 demotion.

To demonstrate a causal connection between protected activity and an adverse action, a plaintiff must show that the desire to retaliate was the but-for cause of the challenged employment action. *Nassar*, 133 S. Ct. at 2528. Temporal proximity may support an inference of causality, so long as the temporal proximity is "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001). Here, the time period between the complaint and the demotion was 21 months, which is too remote to support an inference of causality. *See id.* at 274 ("Action taken . . . 20 months later suggests, by itself, no causality at all"); *Ahern v. Shinseki*, 629 F.3d 49, 58 (1st Cir. 2010) ("Without some corroborating evidence suggestive of causation . . . a gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action"). Therefore, Mr. LaBrecque must offer some other evidence of causality in order to establish a prima facie claim of discrimination for his demotion.

However, the record fails to corroborate any causal connection between the 2011 complaint and demotion. To the contrary, the record tends to refute an inference of retaliation. First, the supervisor who demoted Mr. LaBrecque in October 2012, Fred Kunz, is the same supervisor who previously promoted Mr. LaBrecque in March 2011, and again in November 2011, with full knowledge of his EEO complaint. Courts have held that when the same actor who allegedly discriminated against a plaintiff

previously hired or promoted that plaintiff, a strong inference arises that there was no discrimination. *See Cosme-Perez v. Mun. of Juana Diaz*, 110 F. Supp. 3d 357, 373 (D.P.R. 2015); *see also LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 847 (1st Cir. 1993). Although there are some factual disputes over whether Mr. Kunz gave Mr. LaBrecque the promotion as a result of the EEO complaint, and whether he told Mr. LaBrecque the promotion would last for a year during the mediation, the disputes are not material. The bottom line is that the record confirms that Mr. Kunz promoted Mr. LaBrecque after he complained, with knowledge of that complaint.

Second, in addition to the promotion, Mr. LaBrecque received two positive performance evaluations post-complaint. He received a mid-year evaluation in April 2011 that indicated that he was "starting out on the right foot as a new supervisor." DSMF ¶ 24; PRDSMF ¶ 24. He also received fairly positive feedback from Mr. Kays during his end-of-the-year evaluation on November 23, 2011 which stated that his performance was acceptable overall and that if he "keeps up the good work he will do just fine." DSMF ¶ 30; PRDSMF ¶ 30. These positive developments after the EEO complaint cut against any plausible inference of retaliation. *See Bennett*, 507 F.3d at 32 (stating that the fact that plaintiff received a raise and a more favorable performance review in the year after he filed the grievance than in the year preceding the filing cut against inference of retaliation).

Third, Mr. Kunz was not the subject of Mr. LaBrecque's original EEO complaint. At the time of Mr. LaBrecque's complaint about age discrimination by his supervisors, Mr. Hamil was the Code 970 Superintendent and Mr. Hudson was the

58

Shop 71 General Foreman.  Mr. LaBrecque has offered no evidence that would ground a reasonable inference that Mr. Kunz would be moved to retaliate on Mr. Hudson or Mr. Hamil's behalf.  Therefore, it is even more unlikely that Mr. Kunz's decision to demote Mr. LaBrecque was in retaliation for his complaint to the EEO.  *See Bennett*, 507 F.3d at 32; *see also Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 82 (D.D.C. 2015).

The Court is sympathetic with Mr. LaBrecque, especially considering the decision to demote him came right on the heels of his discussions with Mr. Brigham and Mr. Burk about the Cincotta allegations and Mr. Kunz's initial failures to keep them separated.  There is also evidence that Mr. Kunz was angry after these meetings based on the comments Mr. Kays made to Mr. LaBrecque.  *See* PSAMF ¶ 20; DRPSAMF ¶ 20.  However, the Court already concluded that these discussions were not protected; the Court cannot hold the Navy liable under the ADEA for general retaliation, not based on age.  Therefore, because there is not sufficient evidence for a reasonable jury to conclude that there is a causal connection between the January 2011 EEO complaint and the 2012 demotion, summary judgment is granted with respect to the demotion.

### 3.  Denial of Overtime Opportunities

According to the Navy, Mr. LaBrecque identified three specific instances in which he was allegedly denied overtime opportunities: (1) in October 2012 when he was denied "fill-in time as a supervisor" when working on the Pasadena project; (2) when he was working the 285 building in late 2012; and (3) when he worked for Ms. Nesbitt in and around January 2013.  *Def.'s Mot.* at 26.  The Navy concedes that

denial of overtime is an adverse employment action but argues that the denials are not causally connected to any protected activity.  *Id.* at 23, 26.

As for the 2012 denials, the Court agrees that there is no causal connection between these adverse employment actions and Mr. LaBrecque's protected activity. Mr. LaBrecque complained to the EEO in January 2011 and the alleged denials of overtime occurred almost two years later, undercutting any inference of causation. *See Breeden*, 532 U.S. at 274; *Ahern*, 629 F.3d at 58.  Additionally, the individuals who allegedly denied Mr. LaBrecque overtime opportunities in 2012, Mr. Kays and Mr. Abbott, were not the subjects of Mr. LaBrecque's EEO complaint, making any discriminatory motive unlikely.  *See Bennett*, 507 F.3d at 32; *Mokhtar*, 83 F. Supp. 3d at 82.  Furthermore, Mr. LaBrecque was awarded some overtime opportunities, at least while working in Building 285, which tends to break the causal connection as to the retaliation claim.  *See Bennett*, 507 F.3d at 32-33 (holding that interim positive developments cut against any plausible inference of retaliation).

The alleged denial of overtime opportunities in January 2013 post-dates the January 2013 EEO complaint.   However, the record fails to generate the reasonable inference that the Supervisor who denied Mr. LaBrecque the overtime opportunity, Ms. Nesbitt, had a retaliatory motive.  There is a factual dispute as to whether Ms. Nesbitt was even aware that Mr. LaBrecque had engaged in any EEO-related activity when he was denied overtime.  This factual dispute is material because "[t]here must be proof that the decision maker knew of the plaintiff's protected conduct when he or she decided to take the adverse employment action."  *Echevarria v. AstraZeneca LP*,

133 F. Supp. 3d 372, 402 (D.P.R. 2015) (quoting *Pina*, 740 F.3d at 801 (quoting *Pomales v. Celulares Telefónica, Inc.*, 447 F.3d 79, 85 (1st Cir. 2006))).  Ms. Nesbitt says in her sworn statement that she did not know about the EEO complaint until February 11, 2013, after the alleged denial of overtime.  Mr. LaBrecque asserts that she knew officially in January 2013 but provides no facts to demonstrate how he knew that information.  In fact, when asked if she knew unofficially before then, he just suggests that she must have known because everyone else knew.  This sort of conjecture is not sufficient to overcome summary judgment.  *Alvarado v. Donahoe*, 687 F.3d 453, 460 (1st Cir. 2012); *Bennett*, 507 F.3d at 31.

Even if Ms. Nesbitt did know about the complaint, an inference of retaliatory motive is not reasonable.  Ms. Nesbitt was not the subject of either of Mr. LaBrecque's EEO complaints and there is no information to suggest she would retaliate on another supervisor's behalf.  *See Bennett*, 507 F.3d at 32; *Mokhtar*, 83 F. Supp. 3d at 82.  Moreover, Ms. Nesbitt provided a legitimate, nondiscriminatory reason for not choosing Mr. LaBrecque–his poor job performance–and Mr. LaBrecque offered no evidence that suggests her reason was pretextual.  He only argues that his performance was not poor, but courts have stated that it is not what the plaintiff believes, but whether the decision maker actually believed her rationale and acted on that belief.  *See Bennett*, 507 F.3d at 31–32.  Mr. LaBrecque does not dispute the fact that Ms. Nesbitt believed his performance was poor and chose another Worker Leader to fill-in over him because of this belief; he just says that she never communicated those concerns to him.  *See* PRDSMF ¶ 66.

61

Accordingly, the Court grants summary judgment with respect to the denials of overtime opportunities.

### 4.    Other Alleged Acts of Harassment

In addition to the demotion and loss of overtime opportunities, Mr. LaBrecque claims that the Navy engaged in retaliatory harassment through other acts, such as the failure to accommodate the agreement not to work with Mr. Cincotta; his assignment to the mock-up facility; the negative performance evaluations; the locker reassignment; and the QSL discussion and Letters of Caution and Requirement.[68] The Navy objects to each of these acts arguing that they do not constitute adverse employment actions and are not causally connected to the EEO complaint.

To satisfy the second prong of the prima facie case of retaliation, a plaintiff must show that his employer took some "objectively and materially adverse action" against him.  *Bhatti v. Trs. of Boston Univ.*, 659 F.3d 64, 73 (1st Cir. 2011).  For retaliatory action to be material, "it must produce a significant, not trivial, harm." *Colón-Fontánez v. Mun. of San Juan*, 660 F.3d 17, 36 (1st Cir. 2011).  However, the action is "not limited to discriminatory actions that affect the terms and conditions of employment."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006).  A plaintiff may satisfy this requirement by showing that the challenged action "might have dissuaded a reasonable worker from making or supporting a charge of

---

[68]     Mr. LaBrecque asserts several other acts of harassment and retaliation in 2014 in his Amended Complaint, such as the missing doctors' notes and failure to provide him with the Cincotta investigation report.  *See Am. Compl.* ¶ 46.  However, Mr. LaBrecque has not supplied sufficient facts in support of any of these theories to generate a trial worthy issue.  Therefore, the Court grants summary judgment based on these other claims as well.

discrimination." *Morales-Vallellanes v. Potter*, 605 F.3d 27, 36 (1st Cir. 2010) (quoting *Burlington N.*, 548 U.S. at 64). This objective assessment "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Ahern*, 629 F.3d at 55–56 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). "Minor disruptions in the workplace, including 'petty slights, minor annoyances, and simple lack of good manners,' fail to qualify." *Morales-Vallellanes*, 605 F.3d at 36 (quoting *Burlington N.*, 548 U.S. at 68).

### a.      Failure to Abide by Agreement re: Cincotta

Mr. LaBrecque complains about the Navy's failure to accommodate the agreement between him and Mr. Kunz not to work with Mr. Cincotta. Essentially, he argues that by assigning them to work together, the Navy tolerated a hostile work environment. An employer's toleration of harassment by other employees may qualify as an adverse employment action. *See Hernandez-Torres v. Intercont'l Trading, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998). However, as the Court already discussed, there is no evidence in the record that suggests that the Navy tolerated this harassment. Shipyard officials quickly investigated the allegations, cleared Mr. LaBrecque of the accusations, and then attempted to keep Mr. LaBrecque separated from Mr. Cincotta for over a year, despite push-back from the union and frequently changing projects. Although an argument could be made that the Navy could have done more, say by disciplining Mr. Cincotta, the Navy did not act negligently by failing to do so. *See Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 401 (1st Cir. 2002) ("To establish employer liability for a non-supervisory co-employee, a plaintiff must

demonstrate that the employer knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate action") (internal quotations omitted).  Here, the Shipyard officials acted promptly, having concluded that there was insufficient evidence to substantiate the allegations.  *See* DSMF ¶ 28; PRDSMF ¶ 28; PSAMF ¶ 8; DRPSAMF ¶ 8.  Although the Navy may have responded differently, the First Circuit has cautioned that the ADEA does not permit courts to act as "super personnel departments, assessing the merits—or even the rationality— of employers' nondiscriminatory business decisions."  *Mesnick*, 950 F.2d at 825.  On this record, there are not sufficient facts to conclude that the Navy subjected Mr. LaBrecque to a hostile work environment.

### b.    Assignment to Mock-Up Facility

Mr. LaBrecque also argues that Mr. Kunz assigned him to the mock-up facility in retaliation for his EEO complaint.  In appropriate circumstances, disadvantageous work assignments may qualify as materially adverse.  *See Morales-Vallellanes*, 650 F.3d at 38 (citing *Valentin-Almeyda v. Mun. of Aquadilla*, 447 F.3d 85, 95 (1st Cir. 2006)).  For example, "[a]n objectively reasonable loss of prestige is one factor suggesting that a change of duties may constitute a materially adverse action." *Billings v. Town of Grafton*, 515 F.3d 39, 53 (1st Cir. 2008) (citing *Burlington N.*, 548 U.S. at 71).  The Court assumes that the assignment to a painting/blasting training facility was materially adverse given Mr. LaBrecque's years of experience and roles as a Supervisor and Worker Leader.  The Court also assumes that Mr. Kunz's rationale that Mr. LaBrecque would be good for the position and serve as a model for

the trainees was pretextual given the fact that, as Mr. LaBrecque suggests, he was not in a supervisory role or training other workers during his time spent there. Still, Mr. LaBrecque's claim fails because he has not demonstrated any causal connection between this assignment and his protected conduct. For the same reasons his claim for the demotion fails, this assignment, which occurred over two years after an EEO complaint directed at other supervisors, must fail.

### c.    Negative Performance Evaluations

Mr. LaBrecque alleges that he received negative performance evaluations in retaliation for his complaints to EEO. There is a factual dispute over whether Mr. LaBrecque's negative evaluation in September and November 2012 were warranted. Mr. LaBrecque claims that his work during this time was not shabby or incomplete. However, Mr. Kays, relying on his own observations, feedback from other supervisors, and written turnover sheets, concluded the opposite. This factual dispute is material to prong two of the prima facie case because "unwarranted" negative job evaluations may constitute an adverse employment action. *See Hernandez-Torres*, 158 F.3d at 47.

Despite this factual dispute, there is still not sufficient evidence for a reasonable jury to conclude that there was any causal connection between these evaluations and Mr. LaBrecque's January 2011 EEO complaint. The evaluations took place almost two years later. *See Breeden*, 532 U.S. at 274; *Ahern*, 629 F.3d at 58. Additionally, the EEO complaint was directed at Mr. Hamil and Mr. Hudson, neither of whom completed these performance evaluations, and there is no evidence

65

to suggest that Mr. Kays would retaliate on their behalf.  Further, Mr. Kays was not aware of the EEO complaint when he completed these evaluations.  DSMF ¶ 52. Therefore, Mr. LaBrecque has not provided sufficient facts to support his claim of retaliation for the evaluations.

### d.    Locker Reassignment

Additionally, Mr. LaBrecque argues that the decision to move his locker outside the supervisor area was in retaliation for his complaint.  For the reasons earlier described, there is insufficient evidence to conclude that this employer action, taking place in December 2012, was causally connected to Mr. LaBrecque's January 2011 EEO complaint.  In addition, the Court has trouble seeing how this action was materially adverse.  Mr. LaBrecque does not allege that he lost any tangible benefits due to the reassignment.  *See Paquin v. MBNA Mktg. Sys., Inc.*, 233 F. Supp. 2d 58, 67 (1st Cir. 2002) (holding that new seating assignment, even if it isolated the plaintiff, was not materially adverse).  It is true that the reassignment of his locker placed him in the same locker area as Mr. Cincotta, which caused him distress; however, Mr. Cincotta's allegations occurred two years before and there is no evidence of further harassment by Mr. Cincotta since that time.  Therefore, the Court concludes that although it may have been upsetting to Mr. LaBrecque, the locker reassignment was not materially adverse.  *See id.* at 66 ("Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action") (quoting *Blackie v. Maine*, 75 F.3d 716, 725 (1st Cir. 1996)).

e.    QSL Discussion, Letter of Caution, & Letter of
Requirement

Finally Mr. LaBrecque argues that the QSL discussion and Letters of Caution
and Requirement were in retaliation for his complaints.  There is a dispute over
whether these discussions and letters were "disciplinary."  Assuming that they are, a
reprimand may constitute an adverse action if it carries with it tangible consequences
and could dissuade a reasonable employee from making or supporting a charge of
discrimination.  *Bhatti*, 659 F.3d at 73 (citing *Billings*, 515 F.3d at 54–55).  Here,
though, there is no evidence that the QSL discussion and letters had material
tangible consequences.    Rather, each was merely directed at correcting some
workplace behavior that management perceived as needing correction; Mr.
LaBrecque's working conditions were never altered.  *Id.*  Mr. LaBrecque suggests that
he was blameless and that the sick days were because he was actually sick or meeting
with the EEO and EAP counselors regarding his issues.  Still, even if blameless, "a
criticism that carries with it no consequences is not materially adverse and therefore
not actionable."  *Id.*

Additionally, Mr. LaBrecque was not being singled out.  The QSL discussions
were held with eight other employees during that time, which cuts against any
argument of retaliatory motive.  DSMF ¶ 68.  Indeed, the Navy says that in the two
years before Mr. LaBrecque's QSL discussion, it held QSL discussions with
approximately eighty-eight other Shop 71 employees.  DSMF ¶ 71.  What matters in
determining retaliatory motive and pretext is the decision maker's belief and whether
she acted on that belief.  *See Bennett*, 507 F.3d at 31–32.  There is no evidence to

67

suggest that Ms. Nesbitt, in having the QSL discussion, or Mr. Thayer, when issuing the letters, did not believe that they were warranted.  Therefore, the Court concludes that there is not sufficient evidence for a reasonable jury to conclude that the QSL discussion or letters were retaliatory.

### B.   Hostile Work Environment Claim

The Court turns to the hostile work environment claim.  A plaintiff may bring a hostile work environment claim under the ADEA in the First Circuit.  *Collazo*, 535 F.3d at 44.  To prove a prima facie cause of hostile work environment, a plaintiff must show that he was "subjected to severe or pervasive harassment that materially altered the conditions of [his] employment."  *Noviello*, 398 F.3d at 92 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)).  The harassment must be "objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Id.*  The Court typically looks to the totality of the circumstances, analyzing "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" in order to determine whether a hostile work environment exists.  *O'Rourke v. City of Providence*, 235 F.3d 713, 728–29 (1st Cir. 2001) (quoting *Faragher,* 524 U.S. at 787–88); *see also Harris*, 510 U.S. at 23.  To support liability, the circumstances must reflect a workplace permeated with discriminatory intimidation, ridicule, and insult.  *Echevarria*, 133 F. Supp. 3d at 404.

In Mr. LaBrecque's amended complaint and pleadings, he points to several grievances that he believes created a hostile work environment, including: (1) comments by coworkers and managers; (2) the Cincotta allegations; (3) the assignment to work with Mr. Cincotta and Ms. Saucier-Decatur and the Shipyard's failure to abide by its agreement to keep them separated; (4) his assignment to the mock-up facility; (5) negative performance evaluations; and (6) the moving of his locker.   As an initial matter, these allegations closely track Mr. LaBrecque's retaliation claim.  Courts have stated that allowing standard discrimination claims to be "converted into a contemporaneous hostile work environment claim runs the risk of significantly blurring the distinction between the elements that underpin each cause of action and the kinds of harm each was designed to address."  *Williams v. Spencer*, 883 F. Supp. 2d 165, 180 (D.D.C. 2012).  The Court therefore focuses on whether, in the aggregate, the acts amount to a hostile work environment.  *Bhatti*, 659 F.3d at 74.

With the exception of the Cincotta allegations, which fail for other reasons as the Court has discussed, none of Mr. LaBrecque's allegations, alone or cumulatively, meets the demanding standards of a hostile work environment.   A hostile work environment claim is not a cause of action for the "ordinary tribulations of the workplace." *Faragher*, 524 U.S. at 788.  The standard is designed to be "sufficiently demanding" to ensure that antidiscrimination statutes do not become "general civility code[s]."   *Id*.   Mr. LaBrecque's work environment was not ideal, but the facts supporting his hostile work environment claim boil down to demeaning comments by

supervisors and co-workers, a couple of critical performance evaluations and discussions about sick leave, and some unsatisfactory work assignments.  These common workplace challenges do not show an environment so sufficiently pervasive or severe so as to alter the conditions of the plaintiff's employment.  *See Colon-Fontanez*, 660 F.3d at 44 (holding that a supervisor's avoidance of an employee, failure to take action against various employees who made comments about the employee, and restriction of employee's movement did not create hostile work environment); *Bhatti*, 659 F.3d at 73 (holding that letters and discussions of reprimand for minor infractions and regular belittlement and mistreatment by supervisors were not sufficient); *see also Williams*, 883 F. Supp. 2d at 181 (holding that lack of communication with supervisor, the handling of sick leave, and an unsatisfactory performance evaluation did not create hostile work environment).

To demonstrate the severity and egregiousness of the alleged harassment, Mr. LaBrecque points to the fact that he experiences an extreme amount of stress and anxiety, resulting in him seeking help from counselors and taking sick leave. However, psychological counseling "is evidence of subjective offense, at best."  *See Bhatti*, 659 F.3d at 74.  It does not demonstrate that the environment was objectively offensive.  *See Noviello*, 398 F.3d at 92 (explaining that standard for hostile work environment is both subjective and objective); *Bhatti*, 659 F.3d at 74 ("[W]here a workplace objectively falls short of that 'abusive' high-water-mark, it cannot sustain a hostile-work-environment claim").

Moreover, even if the combination of all these acts could be considered sufficiently pervasive and severe to constitute a hostile work environment, Mr. LaBrecque has failed to establish that any of these acts of harassment were age-based or in retaliation for his EEO complaints. *See Alvarado*, 687 F.3d at 459 ("[I]t is only those actions, directed at a complainant, that stem from a retaliatory animus which may be factored into the hostile work environment calculus") (quoting *Noviello*, 398 F.3d at 93). Many of the acts occurred long after Mr. LaBrecque's initial EEO complaint and before his second complaint, and the acts were all done by different people, some of whom, such as Mr. Kays and Mr. Glennon, were not even aware of his protected conduct when the acts took place, and none of whom was the subject of his original EEO complaint. Mr. LaBrecque has failed to produce sufficient evidence to demonstrate that any of the alleged harassment was based on a protected characteristic; here, on age. Thus, his hostile work environment claim must fail.

The Court recognizes that in retaliation cases, courts are often reluctant to grant summary judgment because motive and intent are typically at issue. *See, e.g.*, *Julia v. Janssen, Inc.*, 92 F. Supp. 2d 25, 28 (D.P.R. 2000). However, summary judgment is appropriate in retaliation cases "if the non-moving party rests only upon conclusory allegations, improbable inferences, and unsupported speculation." *Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851, 855–56 (1st Cir. 2008); *see also Vives v. Fajardo*, 472 F.3d 19, 21 (1st Cir. 2007). That is essentially what Mr. LaBrecque has done here. He speculates as to the motives and intent of several different supervisors at the Shipyard but has failed to ground his conjectures in specific facts and draws

mostly improbable inferences, given the record evidence.  Therefore, the Court grants

summary judgment as to all of Mr. LaBrecque's claims.[69]

## VI.   CONCLUSION

The Court hereby GRANTS the Defendant's Motion for Summary Judgment

(ECF No. 51).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 16th day of February, 2017

---

[69]     The Navy also argues that the ADEA requires a showing of actual pecuniary losses and that Mr. LaBrecque has failed to make that showing here.  *Def.'s Reply* at 12 (citing *Collazo*, 535 F.3d at 44).  Because the Court reaches its decision on other grounds, it need not address the damages issue.